**GREAT AMERICAN INSURANCE COMPANY, Appellant,**

v.

**NORTH AUSTIN MUNICIPAL UTILITY DISTRICT NO. 1, Appellee.**

No. 3–92–182–CV.

Court of Appeals of Texas, Austin.

March 31, 1993.

Publication Ordered June 15, 1995.

Arthur F. Selander, Quilling, Selander, Cummiskey, Clutts & Lownds, P.C., Dallas, for appellant.

Charles D. Olson, Olson, Stem & Buenger, Waco, Scott R. Kidd, Brown McCarroll & Oaks Hartline, Austin, Albert A. Carrion, Jr., Hilgers & Watkins, P.C., Austin, William Knolle, Hearne, Knolle, LeWallen, Livingston & Holcomb, Austin, for appellee.

Before CARROLL, C.J., and JONES and KIDD, JJ.

JONES, Justice.

## I. INTRODUCTION

The North Austin Municipal Utility District No. 1 ("MUD"), appellee, filed suit against Great American Insurance Company ("Great American"), appellant, Underground Utilities Company ("Underground Utilities"), Dippel Ulmann & Associates, Inc. ("Dippel Ulmann"), and Smith Pump Company, Inc. ("Smith Pump"), alleging that the defendants had used a defective component in the construction of a waste-water system for MUD. Following a jury trial, the trial court rendered judgment in favor of MUD and against all four defendants.

Great American is the only defendant that perfected an appeal from the trial court's judgment. On appeal, Great American attacks the judgment on the basis of (1) the determination of Underground Utilities' underlying liability, from which Great American's liability derives; (2) the charge submitted to the jury; (3) the applicability of article 21.21 of the Insurance Code, Tex.Ins.Code Ann. art. 21.21 (West 1981 & Supp.1993); (4) the sufficiency of the evidence to support the jury's findings for violations of article 21.21 and the exclusion of evidence pertinent to Great American's defense to MUD's claims under article 21.21; (5) the award of attorney's fees; and (6) the inclusion of prejudgment interest as part of MUD's actual damages for purposes of trebling such damages. We will affirm the judgment of the trial court.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This suit involves a project for the construction of the Rattan Creek Lift Station, a waste-water lift station. Underground Utilities was the general contractor for the project; Dippel Ulmann was the engineer; Smith Pump was a subcontractor; and Great American was the construction surety, furnishing both performance and maintenance bonds on behalf of Underground Utilities, its principal, and in favor of MUD, its obligee.

The lift station at issue in the present case consisted of a wet well/dry well configuration. Under this system, both the wet well and dry well are buried in the ground. The wet well is fabricated out of poured concrete and serves as a collection tank for waste water delivered by local gravity pipe lines. The dry well consists of a prefabricated metal container and houses the pumping equipment used to pump the water from the wet well into a force main pipe system.

Before advertising for bids on the project, MUD requested Dippel Ulmann (then known

as Carlson & Dippel, Inc.), which was under contract to provide engineering services for MUD, to assess the feasibility of refurbishing and relocating an existing dry well owned by MUD that was scheduled to be taken out of service. After receipt of Dippel Ulmann's initial research, MUD authorized Dippel Ulmann to proceed. Dippel Ulmann then drafted plans and specifications for the construction project. The plans did not indicate any specific requirement for the thickness of the sides for the dry well. In addition, the specifications merely required that the thickness of the sides be sufficient "for the depth of burial."

MUD advertised for bids and requested that bidders provide alternative bids: one for a newly constructed dry well and the other for the refurbishment and relocation of the existing dry well. The bid package included the plans and specifications prepared by Dippel Ulmann. There was no indication in the bid package that the plans and specifications would be varied if the bid were awarded based on the refurbishment alternative. In August 1987, Underground Utilities was awarded the contract on the basis of its bid of approximately $360,000 for the refurbishment and relocation of the existing lift station. Great American then issued a performance bond on behalf of Underground Utilities and in favor of MUD.

Underground Utilities hired Smith Pump as a subcontractor to refurbish the existing dry well. Smith Pump submitted shop drawings to Dippel Ulmann, the engineer, indicating the manner in which it proposed to refurbish the existing lift station. The shop drawings did not indicate that Smith Pump would thicken the sides of the dry well. Dippel Ulmann approved the drawings and Smith Pump performed the work in conformity with the drawings. The refurbished dry well was then delivered to Underground Utilities. The project was completed, and the lift station was activated in April 1988. MUD accepted the project as substantially complete in December 1988.

The contract between MUD and Underground Utilities provided for a one-year correction period after MUD's acceptance of the project. This provision required Underground Utilities to correct or replace any defective work. In connection with Underground Utilities' obligation under this provision, Great American as surety issued a one-year maintenance bond in favor of MUD.

On March 10, 1989, MUD discovered a structural deformity in the "shell" of the dry well: one of the sides was beginning to collapse. Based on an investigation by a structural engineer, MUD concluded that the collapse was occurring because the sides of the dry well were not of sufficient thickness for the depth of burial. MUD requested Underground Utilities to make repairs pursuant to the correction-period provision of the contract. Underground Utilities refused to make any repairs, claiming that (1) it had performed all work in accordance with the plans and specifications; (2) Dippel Ulmann had approved the work; (3) MUD had accepted the work; and (4) Smith Pump was liable under its manufacturer's warranty for the deformity.

MUD then informed Great American that the dry well was suffering from a structural deformity and that Underground Utilities had refused to make repairs. MUD demanded that Great American perform under the terms of its maintenance bond. Great American responded that the structural defect was the result of a design defect for which Underground Utilities was not liable under the terms of the contract. On that basis, Great American asserted that it was not liable under the terms of the bond. Great American did not take any action to effect repairs or make any payments to MUD to cover the cost of repairs.

MUD filed suit, asserting various claims against Underground Utilities, Dippel Ulmann, Smith Pump, and Great American. The jury found that all four defendants were liable; that Great American had knowingly engaged in "unfair or deceptive act[s] or practice[s]"; that MUD's actual damages were $411,400; and that reasonable attorney's fees were one-third of the amount of MUD's recovery. After adding prejudgment interest, the trial court trebled the combined damage sum, awarding MUD a total of $1,558,804.80 in damages and $779,402.40 in attorney's fees against Great American.

Great American, as sole appellant, asserts twenty-four points of error complaining of the trial court's judgment. We will group the points of error and address each in the following order: (1) Excused Liability; (2) Jury Charge; (3) Applicability of Article 21.21; (4) Evidence of Article 21.21 Violations; (5) Attorney's Fees; and (6) Prejudgment Interest.

### III. EXCUSED LIABILITY

In points of error fifteen and sixteen, Great American complains that Underground Utilities was relieved from any liability to MUD and, as a result, the trial court erred in rendering judgment against Great American as surety for Underground Utilities. Although Underground Utilities has not appealed the judgment of the trial court, Great American asserts that any liability it has to MUD as surety for Underground Utilities is strictly derivative of Underground Utilities' liability to MUD. Accordingly, if Underground Utilities was relieved from liability, Great American argues that it, too, is relieved from liability.[1]

■ Great American asserts two bases for the argument that Underground Utilities was relieved from liability. The initial basis is that, in answer to question seven, the jury found that Dippel Ulmann's negligence proximately caused the occurrence, i.e., the structural deformity. Great American contends that, on the basis of this finding, Underground Utilities is relieved from any liability to MUD. We disagree, for two reasons.

■ First, there may be more than one proximate cause of an occurrence. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). The trial court specifically recited this rule in its jury-charge definition of proximate cause. Questions one and two were based on MUD's breach-of-contract claims. In question one, the jury found that Underground Utilities failed to furnish and install a lift station with sides of sufficient thickness for the depth of burial. Further, in question two, the jury found that Underground Utilities failed to correct defective work. The

trial court rendered judgment based on the jury's findings. Although the jury was not asked in questions one and two whether Underground Utilities' actions proximately caused MUD's damages, a finding of proximate cause is deemed found by the trial court in such a manner as to support the judgment. *See* Tex.R.Civ.P. 279.

Second, there is an independent ground on which Underground Utilities may be held liable. Question three was based on MUD's breach-of-warranty claim under the Deceptive Trade Practices Act (DTPA), Tex.Bus. & Com.Code Ann. § 17.46 (West 1987). In answer to this question, the jury found that Underground Utilities' breach of warranty was a producing cause of damages to MUD. This finding provides an independent ground for holding Underground Utilities liable. The jury's finding that Dippel Ulmann's actions were a proximate cause of damages to MUD is irrelevant to the issue of Underground Utilities' liability to MUD, because the jury also found that Underground Utilities' actions were a producing cause of damages under MUD's DTPA claim.

■ As a second basis for claiming that Dippel Ulmann's negligence relieved Underground Utilities from liability to MUD, Great American asserts that the evidence conclusively established that the provisions of the contract relieved Underground Utilities from any liability based on Dippel Ulmann's negligence. As support for its argument, Great American points to article 6.1 of the general conditions of the contract:

> CONTRACTOR [Underground Utilities] shall be solely responsible for the means, methods, techniques, sequences and procedures of construction, but CONTRACTOR shall not be responsible for the negligence of others in the design or selection of a specific means, method, technique, sequence or procedure of construction which is indicated in and required by the Contract Documents. CONTRACTOR shall be responsible to see that the finished

---

1. MUD argues that Great American is independently liable because of its violations of article 21.21. Because we address the issue of Under-

ground Utilities' liability substantively and hold that Underground Utilities was liable, we need not reach this issue.

Work complies accurately with the Contract Documents.

Great American contends that Dippel Ulmann was responsible for the design and selection of the specific means of construction and, therefore, that Underground Utilities as contractor was not responsible for Dippel Ulmann's negligence. We disagree.

Dippel Ulmann was responsible for preparing the plans and specifications included in the bid package that formed the basis of the contract. Section III.C.6 of the specifications indicated that "[t]he thickness of the sides [of the dry well] shall be determined by the structural requirements for the depth of burial." Likewise, the plans did not specify any particular measurement for the thickness of the sides, nor did they instruct the contractor to increase the thickness of the sides of the dry-well shell. The "General Construction Notes" included on the face of the plans, however, stated that "the standard construction specifications current at the time of bidding shall govern materials and methods used to do this work."

Dippel Ulmann identified the standard for determining the thickness of the sides for the dry-well shell in the specifications, but omitted from the plans any specific measurements for complying with this specification. Assuming, without deciding, that the plans and specifications constitute a "design," they were not defective as a whole because the specifications clearly indicated a requirement for the thickness of the sides of the dry-well shell, and the plans designated the specifications as controlling.

Further, the plans and specifications constitute part of the contract documents. The contract documents required that Underground Utilities provide a dry-well shell with sides of sufficient thickness for the depth of burial. The partial collapse of one side of the shell tends to show that the sides were not, in fact, of sufficient thickness for the depth of burial. Since no specific thickness was "required by the Contract Documents," Underground Utilities remained responsible for that decision. Moreover, article 6.1 of the contract's general conditions provides that Underground Utilities, as contractor, "shall be responsible to see that the finished Work

complies accurately with the Contract Documents." We conclude that the foregoing is sufficient evidence to support a finding that Underground Utilities remained liable despite any negligent actions on Dippel Ulmann's part.

■ Great American also argues that the evidence conclusively established that Underground Utilities was relieved from liability because Dippel Ulmann approved Smith Pump's shop drawings, which identified all modifications necessary for the refurbishment of the lift station. We disagree. Article 6.27 of the general conditions expressly states that "ENGINEER's review and approval of Shop Drawings or samples shall not relieve CONTRACTOR from responsibility for any variation from the requirements of the Contract Documents" unless a particular procedure is followed, which did not occur in the present case. Further, Dippel Ulmann placed the following disclaimer on the shop drawings: "This review is for determining general conformity with the contract plans and specifications and shall not relieve the contractor of responsibility for deviations from drawings or specifications, or for errors of any sort in the shop drawings or schedules." Again, the foregoing constitutes some evidence that Underground Utilities remained liable irrespective of any negligent actions by Dippel Ulmann.

We overrule points of error fifteen and sixteen.

## IV. JURY CHARGE

In points of error one through fourteen, Great American asserts several complaints regarding the jury charge. All of Great American's complaints about the charge relate to issues concerning Underground Utilities' liability under the contract documents. As before, Great American raises these issues on appeal based on its derivative-liability theory. In other words, Great American argues that if there was reversible error in the jury charge as to Underground Utilities, there is also reversible error as to Great American. We address the complaints regarding the jury charge in the following or-

der: (1) definitions, (2) measure of damages, and (3) omitted questions/instructions.

### 1. Definitions

■ In points of error one through four, Great American complains that the trial court incorrectly defined the terms "work" and "defective" in question two of the jury charge relating to MUD's claim that Underground Utilities failed to correct defective work as required by the contract. Initially, we note that question two was only one basis for holding Underground Utilities liable; questions one and three provided alternative bases of liability. The jury found in answer to question one that Underground Utilities breached the contract by failing to furnish and install a lift station with sides sufficiently thick for the depth of burial. In answer to question three, the jury found that Underground Utilities breached either an express or implied warranty in connection with the construction project. Great American does not directly complain of any error with regard to questions one and three.[2] When the judgment can be upheld on the basis of multiple findings, error in only one question does not require a reversal. *Spradling v. Williams*, 566 S.W.2d 561, 564 (Tex.1978); *Texas & P. Ry. v. Snider*, 159 Tex. 380, 321 S.W.2d 280, 282–83 (Tex.1959). In other words, even if the trial court erred in submitting the definitions of "work" and "defective" in question two, such error was harmless because we can uphold the judgment based on the jury's answers to questions one and three.

■ Assuming *arguendo* that the jury's findings in questions one and three were not sufficient to uphold the judgment, however, we conclude that the definitions submitted were proper. The form of the definitions included in the jury charge rests within the discretion of the trial court. The applicable standard of review is clear abuse of discretion. *Eoff v. Hal & Charlie Peterson Found.*, 811 S.W.2d 187, 192 (Tex.App.—San Antonio 1991, no writ); *Wolters v. Wright*,

649 S.W.2d 649, 651 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.).

■ Great American argues that the court did not restrict the jury's consideration to the meaning of the terms as defined by the contract. The charge defined "work" as "the Rattan Creek Lift Station." Great American objected and submitted the following definition, which was refused by the trial court:

> You are instructed that "work" is the entire completed construction *or the various separately identifiable parts thereof required to be furnished under the Contract Documents.* Work is the result of performing services, furnishing labor and furnishing and incorporating materials and equipment into the construction, all as required by the Contract Documents.

(Emphasis added.) This definition tracks the definition of "work" in the contract. Great American contends that failing to incorporate the contract definition in the charge constitutes harmful error. We disagree.

The "Agreement" included in the contract documents described the work contracted for as the entire completed project. The agreement stated that "[t]he said Party of the Second Part (CONTRACTOR) hereby agrees with the Party of the First Part (OWNER) to commence and complete the construction of certain improvements described as follows: NORTH AUSTIN MUNICIPAL UTILITY DISTRICT NO. ONE RATTAN CREEK LIFT STATION." The agreement further provided that Underground Utilities would "furnish all the materials, supplies, machinery, equipment, tools, superintendence, labor, insurance and other accessories and services necessary to complete the said construction" in compliance with the plans and specifications included in the contract documents.

We conclude that the trial court did not abuse its discretion in defining "work" as "the Rattan Creek Lift Station" for two reasons. First, the agreement indicated that the project consisted of the construction of the lift station in its entirety. Second, the

---

2. In points of error fifteen and sixteen, Great American asserts that Underground Utilities was excused from any liability. Even if these points could be considered to be an indirect complaint

as to the jury's answers to questions one and three, we have concluded above that the argument asserted in points of error fifteen and sixteen is without merit.

agreement required Underground Utilities to furnish everything necessary to complete the project. In other words, there were no "separately identifiable parts" that Underground Utilities was to furnish under the contract. The trial court was within its discretion in defining "work" in light of the agreement between the parties and in limiting the general contract definition to a definition supported by the specific agreement between the parties.

█ Even if we assume that it was error for the trial court to refuse to submit the definition of "work" as provided in the contract, Great American must demonstrate that such error was harmful—that the error was reasonably calculated to and probably did cause the rendition of an improper judgment. *See* Tex.R.App.P. 81(b)(1). Great American contends that such definition constituted harmful error because the jury was not allowed to consider the construction project in its "various separately identifiable parts" and determine which party was required to furnish such parts. Great American argued at trial that the dry-well shell did not constitute part of Underground Utilities' "work" because the dry-well shell was an existing structure owned by MUD, which MUD was required to furnish under the terms of the contract. We disagree. Even though the dry-well shell used in the lift station was owned by MUD, the parties' contract required Underground Utilities to furnish a refurbished lift station, including a dry-well shell, that complied with the plans and specifications provided in the contract documents. The specifications required that the sides of the dry-well shell be of sufficient thickness for the depth of burial. In the context of a refurbishment contract, Underground Utilities was required to furnish a refurbished dry-well shell with sides sufficiently thick for the depth of burial as part of its "work" under the contract. The dry-well shell was not a separate part to be furnished by MUD; rather, it was a part to be furnished by Underground Utilities under the contract. Accordingly, the definition submitted in the charge did not constitute harmful error because such definition merely prevented the jury from considering an argument that was legally incorrect.

█ Great American also complains that the trial court abused its discretion in defining "defective" as "work that is unsatisfactory, faulty or deficient, or does not conform to the contract and specifications." Great American objected and submitted the following definition, which was refused by the trial court:

> You are instructed that "defective" is an adjective which when modifying the word Work refers to Work that is unsatisfactory, faulty or deficient, or does not conform to the Contract Documents, or does not meet the requirements of any inspection, reference standard, test or approval referred to in the Contract Documents, or has been damaged prior to ENGINEER's recommendation of final payment (unless responsibility for the protection thereof has been assumed by OWNER at Substantial Completion).

This definition tracks the definition of "defective" in the contract. Again, Great American contends that failing to incorporate the contract definition in the charge constitutes error. We disagree.

The definition in the charge incorporated the contract definition, but omitted matters for which there was no evidence. There was no evidence that the lift station did not meet the requirements of any inspection, reference standard, test or approval referred to in the contract documents, or that it was damaged before the engineer's recommendation of final payment. The trial court was within its discretion in defining "defective" as it was defined in the contract, but limiting the definition in light of the evidence presented at trial. We overrule points of error one through four.

## 2. Measure of Damages

█ In points of error five through eight, Great American complains that the trial court submitted instructions that referenced an improper measure of damages in connection with the jury question regarding damages that resulted from Underground Utilities' actions. In its fifth point of error, Great American complains that the trial court abused its discretion in submitting an

explanatory instruction in connection with question four, which instructed the jury to award damages, if appropriate, based on repair or replacement cost. Great American asserts in points of error six and seven that "substantial performance" was the appropriate measure of damages and that the trial court abused its discretion in refusing to submit Great American's requested instructions based on such measure.[3] We disagree.

■■■■ The proper measure of damages is a question of law for the court. *Johnson v. Willis*, 596 S.W.2d 256, 262 (Tex.Civ.App.—Waco), *writ ref'd n.r.e. per curiam*, 603 S.W.2d 828 (Tex.1980). The charge submitted should limit the jury's consideration to facts that are properly part of allowable damages. *Id.* If parties agree to a contractual remedy, such agreement will be enforced unless illegal or against public policy. *See Fidelity & Deposit Co. v. Stool*, 607 S.W.2d 17, 23–24 (Tex.Civ.App.—Tyler 1980, no writ); *see also Tucker v. Northcutt*, 248 S.W.2d 750, 752 (Tex.Civ.App.—Waco 1952, writ ref'd); *Sowell v. Natural Gas Pipeline Co.*, 604 F.Supp. 371, 380 (N.D.Tex.1985), *aff'd*, 789 F.2d 1151 (5th Cir.1986).

In article 13.12 of the general conditions of their contract, Underground Utilities and MUD contracted for a one-year repair or replacement remedy:

> If within one year after the date of Substantial Completion ... any Work is found to be *defective*, CONTRACTOR shall promptly, without cost to OWNER and in accordance with OWNER's written instructions, either correct such *defective* Work, or, if it has been rejected by OWNER, remove it from the site and replace it with *nondefective* Work.

The structural deformity was discovered within one year after the date of substantial completion. Accordingly, article 13.12 applies. Because this provision is neither illegal nor against public policy, it must be enforced. Based on the parties' agreement,

the trial court properly submitted an instruction using repair or replacement as the appropriate measure of damages and did not err in refusing Great American's requested instruction. We overrule Great American's points of error five through seven.

■■■■ In point of error eight, Great American also complains that the trial court erred in failing to submit Great American's requested instruction regarding MUD's obligation to mitigate damages. The mitigation-of-damages doctrine is based on the concept of avoidable consequences: a party may not recover damages that it could have avoided or minimized "at a trifling expense or with reasonable exertions." *Walker v. Salt Flat Water Co.*, 96 S.W.2d 231, 232 (Tex.1936); *see also Copenhaver v. Berryman*, 602 S.W.2d 540, 544 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). However, the breaching party, here Underground Utilities, has the burden to establish the extent to which damages could have been mitigated. *Copenhaver*, 602 S.W.2d at 544. Because Great American refers us to no evidence in the record demonstrating that damages have worsened because of MUD's inaction, the trial court properly refused Great American's requested instruction. Accordingly, we overrule Great American's eighth point of error.

### 3. Omitted Questions/Instructions

In points of error nine through fourteen, Great American complains of various issues the trial court refused to submit to the jury.

■■■■ In points of error nine and ten, Great American complains that the trial court erred in refusing to submit either a question or an instruction regarding mutual mistake of fact. An agreement may be avoided where parties contracted under a misconception or mistake of a material fact. *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). In order to avoid the contract, however, the parties must have acted under the

---

**3.** MUD argues that Great American's objection to the submitted instruction was insufficient to preserve error because the objection was simply conclusory—it merely asserted that the measure of damages was improper. We disagree. Great American both objected on the basis that repair and replacement was the improper measure of

damages and also submitted an instruction identifying substantial performance as the proper measure of damages. By its actions, Great American sufficiently identified the objectionable matter and the grounds for its objection. *See* Tex.R.Civ.P. 274.

same misunderstanding of the same material fact, i.e., there must be a *mutual* mistake. *Lacy v. Ticor Title Ins. Co.*, 794 S.W.2d 781, 784 (Tex.App.—Dallas 1990), *writ denied per curiam*, 803 S.W.2d 265 (Tex.1991). Under the present facts, there is no evidence of such a mutual mistake. There is no evidence that MUD believed the existing dry-well shell used in the refurbishment project complied with the contract specifications. Further, there is no evidence that MUD contemplated that the completed project would not comply with the contract specifications.

■ In addition, the doctrine of mutual mistake does not provide a defense to a breach of contract claim. Rather, it is a ground for rescission of the contract as an equitable remedy. *Newell v. Mosley*, 469 S.W.2d 481, 482–83 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.). Where a party retains a beneficial part of the contract, the contract is affirmed and rescission is barred. *Spellman v. American Universal Inv. Co.*, 687 S.W.2d 27, 30 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). Under the facts of the present case, MUD paid Underground Utilities in full pursuant to the contract, and Underground Utilities retained the payment. As a result, rescission of the contract is not available. Accordingly, we overrule Great American's ninth and tenth points of error.

■ In points of error eleven and twelve, Great American complains that the trial court erred in refusing to submit either a question or an instruction regarding MUD's

failure to comply with its alleged implied warranty of the sufficiency of plans and specifications. Great American contends that MUD impliedly warranted that the plans and specifications included in the bid package were accurate and reliable and that MUD breached this warranty. Several courts of appeals have recognized such an implied warranty. *See Shintech, Inc. v. Group Constructors, Inc.*, 688 S.W.2d 144 (Tex.App.—Houston [14th Dist.] 1985, no writ); *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 624 S.W.2d 203 (Tex.Civ.App.—Houston [1st Dist.] 1981), *rev'd in part on other grounds*, 642 S.W.2d 160 (Tex.1982); *Board of Regents v. S & G Constr. Co.*, 529 S.W.2d 90 (Tex.Civ.App.—Austin 1975, writ ref'd n.r.e.); *Newell*, 469 S.W.2d at 482.

Assuming such a warranty exists, it does not control our decision here. The facts of the present case are distinguishable from prior cases imposing this warranty, because Underground Utilities expressly assumed responsibility for the sufficiency of the plans and specifications. The "Instructions to Bidders" included in the contract documents required Underground Utilities to investigate the sufficiency of the plans and specifications.[4] Further, in its bid proposal, Underground Utilities confirmed that it had fully examined the plans and specifications.[5] The language used in the contract documents in the present case is substantially similar to the language used in the contract documents at issue in *Emerald Forest Utility District v.*

---

4. The Instructions to Bidders provided in pertinent part:

 B. *Interpretation of Contract Documents and Technical Specifications, and Plans*

 Bidders desiring further information, or further interpretation of the Contract Documents and TECHNICAL SPECIFICATIONS and PLANS must make request for such information....

 C. *Conditions of Work*

 *Each bidder is expected to* inform himself fully of the construction and labor conditions under which the work will be performed, and will have inspected the site and *have read and be thoroughly familiar with the Contract Documents, TECHNICAL SPECIFICATIONS, and PLANS.*

 Each bidder shall satisfy himself as to the character, quality and quantities of work to be performed and materials to be furnished. *The submission of a proposal by a bidder shall be*

 conclusive evidence that he has complied with these requirements....
 (Emphasis added.)

5. In its bid proposal Underground Utilities stated:

 The undersigned ... *having examined the plans and specifications with the related documents, having carefully read same, having examined the site of the proposed project,* proposes to furnish all labor, materials, supplies and to construct the project in accordance with the Contract Documents....

 The Contractor, recognizing the importance of this project for the Owner, and by submitting his bid, confirms ... that *he has examined carefully the plans and specifications and confirms that they reflect the full intent of all aspects of the project.*
 (Emphasis added.)

*Simonsen Construction Co.,* 679 S.W.2d 51 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). In that case, the court concluded, based on the contract language, that the contractor had expressly assumed the responsibility for the sufficiency of the plans and specifications. *Id.* at 53. Similarly, we conclude that Underground Utilities expressly assumed responsibility for the sufficiency of the plans and specifications pursuant to the contract provisions referred to above. The trial court properly refused any requested question or instruction regarding any implied warranty of plans and specifications. We overrule points of error eleven and twelve.

■ In points of error thirteen and fourteen, Great American complains that the trial court erred in refusing to submit either a question or an instruction regarding agency. Great American argues that Dippel Ulmann acted as agent for MUD in preparing the plans and specifications and that Dippel Ulmann's negligence should be imputed to MUD, thereby relieving Underground Utilities (and Great American) of liability. We disagree.

■ Whether an agency relationship exists under established facts is a question of law for the court to determine in light of the parties' agreement, words, and conduct. *Ross v. Texas One Partnership,* 796 S.W.2d 206, 210 (Tex.App.—Dallas 1990), *writ denied per curiam,* 806 S.W.2d 222 (Tex.1991). The facts regarding the present contract and the conduct of the parties were not in dispute. Accordingly, the existence of an agency relationship was a question of law for the trial court. The evidence demonstrates that Dippel Ulmann was an independent contractor for MUD rather than its agent. The trial court properly refused Great American's requested instruction/question regarding agency. We overrule Great American's thirteenth and fourteenth points of error.[6]

6. We also note that Dippel Ulmann's negligence could not be imputed to MUD based on Dippel Ulmann's actions as an independent contractor. Neither an owner nor an employer is liable for

## V. APPLICABILITY OF ARTICLE 21.21

■ The trial court rendered judgment based on the jury's findings that Great American engaged in unfair or deceptive acts or practices and failed to deal with MUD fairly and in good faith. In point of error seventeen, Great American argues that the trial court erred in rendering judgment against it because article 21.21 of the Insurance Code, Tex.Ins.Code Ann. art. 21.21 (West 1981 & Supp.1993), does not apply to commercial sureties. The main thrust of Great American's argument is that a commercial surety is not engaged in the "business of insurance" for purposes of article 21.21 and, therefore, Great American could not have violated this provision. We disagree.

The purpose of article 21.21 is to "regulate trade practices in the business of insurance." Tex.Ins.Code Ann. art. 21.21, § 1(a) (West Supp.1993). Article 1.14–1 of the Code defines those acts which constitute "doing an insurance business" and expressly includes the following: "The making of or proposing to make, as guarantor or surety, any contract of guaranty or suretyship as a vocation and not merely incidental to any other legitimate business or activity of the guarantor or surety." Tex.Ins.Code Ann. art. 1.14–1, § 2(a)(2) (West Supp.1993).

■ Conceding that its activities fall within the scope of the definition in article 1.14–1, Great American asserts three arguments why this definition should not apply to article 21.21. First, Great American argues that neither article refers to the other or incorporates the other's definitions. We see no reason, however, to assign different meanings to the phrase "doing an insurance business" in article 1.14–1 and the phrase "business of insurance" in article 21.21. Significantly, neither article *excludes* the definitions of the other. Had the legislature intended to exclude sureties from regulation under article 21.21, it could have done so as it has in other provisions of the Code. For example,

the acts of an independent contractor. *Ross,* 796 S.W.2d at 209 (owner); *Phillips Pipe Line Co. v. McKown,* 580 S.W.2d 435, 438 (Tex.Civ.App.— Tyler 1979, writ ref'd n.r.e.) (employer).

article 21.55 applies to "any insurer authorized to do business as an insurance company," Tex.Ins.Code Ann. art. 21.55, § 1(4) (West Supp.1993), but specifically excludes "fidelity, surety or guaranty bonds," Tex.Ins. Code Ann. art. 21.55, § 5(a)(4) (West Supp. 1993). Clearly, the legislature is capable of drawing such distinctions where it deems necessary.[7]

Second, Great American argues that the definition in article 1.14–1 should not apply to article 21.21 because the purposes of the statutes are different. Great American argues that article 1.14–1 "seeks to define those general business activities which are subject to the overall jurisdiction of the State Board of Insurance," while article 21.21 "seeks to regulate specific activities related to the 'business of insurance' which the legislature has deemed to be unfair or deceptive." This is no real distinction. Article 1.14–1 identifies the "business of insurance" subject to regulation, and article 21.21 specifically regulates trade practices in the business of insurance, prohibiting unfair and deceptive practices. Accepting Great American's argument would allow sureties to be "regulated" as entities engaged in the business of insurance, yet would make it impossible to prohibit them from engaging in unfair or deceptive practices while conducting this business. We reject this illogical construction.

Third, Great American argues that federal case law should control our interpretation of article 21.21's reference to the "business of insurance." Section 1 of article 21.21 states that "[t]he purpose of this Act is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in [15 U.S.C.A. §§ 1011 to 1015]." We do not believe our analysis is inconsistent either with the purpose of the Insurance Code as expressed in article 21.21 or with the intent of Congress as expressed in the referenced sections of the United States Code.

Although we have been unable to find any decision directly addressing whether article 21.21 applies to sureties, one court recently held (without analysis) that an obligee under a commercial surety bond was entitled to recover damages from a surety for violations of article 21.21. *See Lawyers Sur. Corp. v. Royal Chevrolet, Inc.*, 847 S.W.2d 624, No. 6–92–050–CV, slip op. at 10–11 (Tex.App.—Texarkana, writ requested) (not yet published). We overrule point of error seventeen.

## VI. SUFFICIENCY OF EVIDENCE OF ARTICLE 21.21 VIOLATIONS

In points of error eighteen and nineteen, Great American challenges the sufficiency of the evidence to support the jury's finding that Great American violated article 21.21. In point of error eighteen, Great American complains that the evidence is legally or factually insufficient to support the jury's finding that Great American engaged in unfair or deceptive acts or practices. MUD identified several misrepresentations Great American made in violation of article 21.21. These representations were made in connection with communications between Gregory Kilburn, Great American's bond claims manager, and Sharlene Collins, MUD's counsel. If the evidence is sufficient to support any one of the misrepresentations alleged by MUD, the trial court's judgment must be upheld.

Collins notified Great American by phone and through correspondence that the lift station suffered from a structural deformity and that Underground Utilities refused to make repairs. Included in the correspondence was an engineer's report indicating that the thickness of the dry-well shell was insufficient for the depth of burial. In response, Kilburn indicated that the structural deformity was a result of a "design defect," that the project engineer had approved the "design submittals," and that Underground Utilities "properly installed the lift station and its equipment in accordance with the contract documents, plans and specifications." As a re-

---

7. Other activities excluded under article 21.55, § 5 fall within the scope of article 21.21. *See Aetna Casualty & Sur. Co. v. Marshall*, 724 S.W.2d 770 (Tex.1987) (workers compensation insurance); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1 (Tex.1991) (title insurance). Logi-

cally, the intent of the legislature in excluding particular activities from regulation under article 21.55 was to exclude activities that would otherwise be considered within the scope of the Insurance Code.

sult, Kilburn asserted that Great American was not responsible under the terms of its bond.

The specifications included in the contract documents required Underground Utilities to supply a lift station with a dry-well shell of sufficient thickness for the depth of burial. We have concluded above that there was no "design defect" that released Underground Utilities from liability because the specifications were included as part of the "design." Further, there is ample evidence that Underground Utilities did not install the lift station in accordance with the contract documents, plans, and specifications. In addition, the "design submittals" Kilburn referred to were shop drawings, and the contract specifically stated that any approval of such shop drawings by the engineer would not relieve Underground Utilities from liability for any deviation from the specifications. The jury was entitled to conclude based on this evidence that Kilburn's statements constituted misrepresentations in violation of article 21.21. Accordingly, we overrule point of error eighteen.

In point of error nineteen, Great American complains that the evidence is legally or factually insufficient to support the jury's finding that Great American failed to deal with MUD fairly and in good faith. We concluded above that the evidence was sufficient to support the jury's finding that Great American engaged in unfair or deceptive acts or practices. Because this finding is sufficient to support the trial court's judgment, we need not reach point of error nineteen.

In point of error twenty, Great American complains that the trial court erred in excluding evidence relevant to its defense to MUD's claims under article 21.21. MUD was allowed to introduce evidence that, after MUD demanded Great American's performance under its bond, MUD and Great American had little or no contact between May 1989 and January 1990, when suit was filed. However, the trial court excluded evidence tendered by Great American that demonstrated that MUD's attorneys did not attempt to contact Great American regarding the defective lift station from early June through August 26, 1989, a period of approxi-

mately ten weeks. Great American argues that MUD's evidence of lack of communication was an attempt by MUD to prove Great American's intent to repudiate its obligations. Great American claims that the exclusion of its responsive evidence did not allow the jury to hear all evidence relevant to the lack of communication between Great American and MUD.

MUD's failure to contact Great American for a ten-week period is not necessarily relevant to Great American's failure to communicate with MUD. However, even assuming *arguendo* that this evidence was relevant and improperly excluded, Great American has the burden to demonstrate that such error was harmful—that such error was reasonably calculated to and probably did cause the rendition of an improper judgment. Tex.R.App.P. 81(b)(1). We conclude that any error was not harmful. First, the evidence of lack of communication was only part of the evidence MUD introduced to establish Great American's article 21.21 violations. There was other evidence of such violations, e.g., affirmative misrepresentations. The excluded evidence provides no defense to misrepresentation. Accordingly, any error in excluding this evidence was harmless. Second, MUD's evidence demonstrated that there was minimal contact over an entire eight-month period. The fact that evidence was excluded showing that MUD did not contact Great American during ten weeks of that eight-month period would not constitute such an error as would be reasonably calculated to cause the rendition of an improper judgment. Accordingly, we overrule Great American's twentieth point of error.

## VII. ATTORNEY'S FEES

In points of error twenty-one through twenty-three, Great American complains of the trial court's award of attorney's fees to MUD. In question seventeen, the jury was asked to determine MUD's attorney's fees, if appropriate, stated as a percentage of recovery. In response to this question, the jury answered 33⅓ percent.

In point of error twenty-one, Great American complains that the evidence

is legally or factually insufficient to support the jury's finding to question seventeen. Article 21.21 permits the recovery of "reasonable and necessary attorneys' fees." Tex. Ins.Code Ann. art. 21.21, § 16(b)(1) (West Supp.1993). The party seeking to recover attorney's fees carries the burden of proof on this issue. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex.1991). Attorney's fees may not be awarded, however, unless supported by sufficient evidence. *Fairmont Homes, Inc. v. Upchurch*, 704 S.W.2d 521, 525 (Tex.App.—Houston [14th Dist.]), *modified & aff'd*, 711 S.W.2d 618 (Tex.1986).

At trial, MUD relied on the testimony of two witnesses as evidence to support its claim for attorney's fees. Sharlene Collins, general counsel for MUD, testified that MUD engaged counsel on the basis of a contingent-fee contract which specified a 33⅓ percent contingency fee. This contract was admitted into evidence. Further, Mark Perlmutter, MUD's expert witness, testified that the contingent-fee arrangement in this case was a reasonable and customary fee, "but it's on the low side."

Great American does not controvert this testimony. Rather, it claims that this evidence is insufficient to support the award because there was no evidence presented that would allow the jury to properly evaluate the reasonableness of the award, e.g., there was no evidence presented regarding preparation in connection with the case, the novelty or difficulty of the issues involved in the case, or the level of skill required to effectively try the case. Great American cites several cases as authority for its argument; however, the cases cited are distinguishable. In three of the four cases, there was no evidence that a contingency contract existed between the parties. *See Fairmont Homes*, 704 S.W.2d at 526; *Wisznia v. Wilcox*, 438 S.W.2d 874, 879 (Tex.Civ.App.—Corpus Christi 1969, writ ref'd n.r.e.); *Smith v. Davis*, 453 S.W.2d 340, 347 (Tex.Civ.App.—Fort Worth 1970, writ ref'd n.r.e.). In the remaining case, *Brown v. De La Garza Service Center, Inc.*, 576 S.W.2d 134, 136 (Tex. Civ.App.—Waco 1978, no writ), no evidence whatsoever was presented; rather, the award of attorney's fees was based on judicial notice of the reasonableness of the fees requested.

In contrast, MUD presented evidence that a contingent-fee contract existed, submitted the contract into evidence, and presented testimony that the particular contract was reasonable. This uncontroverted evidence was both legally and factually sufficient to support the award of attorney's fees. *See, e.g., Kerrville HRH, Inc. v. City of Kerrville*, 803 S.W.2d 377, 388 (Tex.App.—San Antonio 1990, writ denied); *March v. Thiery*, 729 S.W.2d 889, 897 (Tex.App.—Corpus Christi 1987, no writ); *Hochheim Prairie Farm Mut. Ins. Ass'n. v. Burnett*, 698 S.W.2d 271, 278 (Tex.App.—Fort Worth 1985, no writ); *Liberty Mut. Ins. Co. v. Allen*, 669 S.W.2d 750, 755 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). Accordingly, we overrule Great American's twenty-first point of error.

 In point of error twenty-two, Great American complains that the trial court erred in overruling its objection to question seventeen because such question permitted the jury to award attorney's fees without segregating those fees among the various defendants and various causes of action. As a general rule, when a party seeks to recover attorney's fees in a case involving multiple defendants or multiple causes of action, the party is required to segregate its request for fees among the various defendants and various causes. *Stewart Title Guar. Co.*, 822 S.W.2d at 10–11; *Flint & Assocs. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 625 (Tex.App.—Dallas 1987, writ denied). An exception to this rule, however, allows a party to forgo segregating fees where the claims arise out of the same transaction and are so interrelated that the prosecution or defense requires proof or denial of essentially the same facts. *Stewart Title Guar. Co.*, 822 S.W.2d at 11. As the Texas Supreme Court explained, "when the causes of action involved in the suit are dependent on the *same set of facts or circumstances* and thus are 'intertwined to the point of being inseparable,' the party suing for attorney's fees may recover the entire amount covering all claims." *Id.* (emphasis added).

Great American argues that the claims against the four defendants were "distinct causes of action which required the proof of distinct sets of facts." As support for this proposition, Great American argues that "[t]he claims asserted against Dippel Ulmann, Underground Utilities and Smith Pump, all related to breach of common law or contractual duties relating to the construction of the lift station. In contrast, the claims asserted against Great American involved alleged duties to reasonably and expeditiously evaluate MUD's bond claim." We disagree and conclude that all claims relied on the same set of facts. As Great American itself argued under its excused-liability and jury-charge points of error, its own liability stems from Underground Utilities' underlying liability. In other words, MUD was required to prove its case against Underground Utilities in order to recover from Great American. As a result, the same facts were at issue. We overrule Great American's twenty-second point of error.

In point of error twenty-three, Great American complains that the trial court erred in granting attorney's fees to MUD in an amount exceeding the jury's answer to question seventeen. The trial court awarded MUD $779,402.40 in attorney's fees. Great American argues that this amount constitutes 50 percent of the $1,558,804.80 in damages MUD recovered from Great American, rather than the 33⅓ percent found by the jury to be a reasonable fee.

The contingent-fee contract expressly provides that attorney's fees would be calculated as "33⅓% of the *recovery*," not the *damages*, and MUD's expert witness testified that this arrangement was reasonable. Based on the evidence, the jury found 33⅓ percent of MUD's *recovery* to be a reasonable attorney's fee. The amount a plaintiff is entitled to recover under article 21.21 is "the amount of actual damages *plus court costs and reasonable and necessary attorneys' fees*. If the trier of fact finds that the defendant knowingly committed the acts complained of, the court shall award, in addition, two times the amount of actual damages." Tex.Ins.Code Ann. art. 21.21, § 16(b)(1) (West Supp.1993). MUD's *recovery* in this case, therefore, is

treble damages *plus* a reasonable attorney's fee. In order to enter a proper judgment, the court must calculate the total amount of recovery so that after one-third of that total is allocated to attorney's fees, the remaining sum equals the statutorily-required treble damages. Any other method of calculating attorney's fees would result in awarding the plaintiff either less than the 33⅓ percent fees found by the jury, or less than the treble-damages award required by the statute. We conclude that the trial court did not err in calculating MUD's attorney's fees. Accordingly, we overrule Great American's twenty-third point of error.

## VIII. PREJUDGMENT INTEREST

In point of error twenty-four, Great American complains that the trial court erred in trebling prejudgment interest as part of MUD's actual damages. This Court has previously addressed this issue and concluded that when, as here, prejudgment interest is properly an element of actual damages, it must be included before the trebling of damages. *Celtic Life Ins. Co. v. Coats*, 831 S.W.2d 592, 598–99 (Tex.App.—Austin 1992, writ granted); *Paramore v. Nehring*, 792 S.W.2d 210, 212 (Tex.App.—Austin 1990, no writ). Accordingly, we overrule Great American's twenty-fourth point of error.

## IX. CONCLUSION

We affirm the judgment of the trial court.