**ST. JOSEPH HOSPITAL, Appellant,**

v.

**Stacy Lynn WOLFF, Individually; and Ray Wolff and Sandra Wolff, Individually and as next friends of Stacy Lynn Wolff, Appellees.**

No. 03–97–00718–CV.

Court of Appeals of Texas, Austin.

Aug. 26, 1999.

Rehearing Overruled Oct. 14, 1999.

Reagan W. Simpson, Fulbright & Jaworski, L.L.P., Houston, for Appellant.

William O. Whitehurst, Whitehurst, Harkness, Ozmun & Archuleta, P.C., Austin, for Appellee.

Before Justices JONES, B.A. SMITH and YEAKEL.

LEE YEAKEL, Justice.

Appellees, Stacy Lynn Wolff ("Stacy") and her parents, Ray and Sandra Wolff,

individually and as next friends of Stacy,[1] brought a medical-malpractice action against appellant St. Joseph Hospital ("St.Joseph") for the alleged negligent treatment of Stacy by one of St. Joseph's surgical residents, Dr. Mario Villafani. Following a jury trial, the district court rendered judgment in favor of the Wolffs. St. Joseph appeals the judgment on the primary assertion that it is not liable for Dr. Villafani's negligence. St. Joseph also asserts various jury charge, evidentiary, and statutory errors. We will affirm the district-court judgment.

## BACKGROUND

St. Joseph, a private hospital located in Houston, operates a general surgery residency program ("General Program").[2] To provide its surgical residents with "extensive experience in general surgery" and to ensure its surgical program accreditation, St. Joseph established the Integrated General Surgery Residency Program ("Integrated Program") with the Central Texas Medical Foundation (the "Foundation"), a nonprofit organization that renders medical treatment to patients at Brackenridge Hospital ("Brackenridge") in Austin by operating accredited medical-residency training programs. Through this program, St. Joseph assigns surgical residents in its General Program to train in the Integrated Program with the Foundation at Brackenridge.

In May 1994, Stacy Wolff was in a serious car accident while a passenger in an automobile operated by a friend. After initial emergency treatment at the scene of the accident, the unconscious Stacy was taken to Brackenridge by helicopter where she was admitted to the hospital's intensive-care unit and placed on a ventilator because she could not breathe without assistance. Upon her admission to Brackenridge, Stacy's attending physician was Dr. David Harshaw, an experienced surgeon and the director of surgical education for the Foundation. The next day Stacy was assigned to Dr. Villafani, a third-year surgical resident from St. Joseph on assignment at Brackenridge through the Integrated Program. At that time all of the surgery residents at Brackenridge were from St. Joseph.

Several days later, due to Stacy's continued dependence on a ventilator, Doctors Harshaw and Villafani performed a tracheostomy[3] on Stacy. A few days following the procedure, Stacy began to lose a significant amount of blood from the area where the tracheostomy had been performed. Dr. Villafani examined Stacy when the blood loss was first realized, but, after running several tests, decided not to call the attending physician or chief resident for assistance. Within a few hours of his examination, Stacy suffered from a tracheoinnominate fistula[4] and began to bleed profusely. Because of this blood loss, Stacy's heart began to fibrillate and she eventually went into cardiac arrest. As a result, Stacy suffered permanent brain damage.

The Wolffs brought a medical-malpractice claim against Doctors Villafani and Harshaw, Brackenridge, St. Joseph, the Foundation, and other persons on the medical staff at Brackenridge involved in Stacy's treatment, alleging, *inter alia*, that (1) the defendants were vicariously liable

1. We will refer to the appellees collectively as the "Wolffs."

2. Residency programs, the second phase of graduate medical education, are designed to train physicians who have recently graduated from medical school in a medical specialty "through the process of their providing patient care under supervision." American Medical Association, 1993–94 Graduate Medical Education Directory 9 (1993).

3. A tracheostomy is a surgical procedure whereby a tube is placed in the patient's throat so that the patient can breathe through her neck. The procedure is used in lieu of an oral tracheal tube to assist with mouth care.

4. A tracheoinnominate fistula is a condition that occurs when an opening forms between the trachea and an innominate artery, allowing blood to flow into the airway.

for Dr. Villafani's negligence; and (2) St. Joseph and the Foundation were engaged in a joint venture or joint enterprise and are thus jointly liable for any negligent acts or omissions of Dr. Villafani. At the time of trial, all defendants had settled except St. Joseph.

Following a trial on the Wolffs' claims against St. Joseph, the jury found, in pertinent part, that the cardiac respiratory arrest that resulted from Stacy's tracheoinnominate fistula was a serious, permanent, and disabling injury proximately caused by the negligence of Dr. Villafani while he was employed by the Foundation and acting within the scope of such employment.[5] The jury awarded Stacy $8,000,000 and Ray and Sandra Wolff $750,000 each for past and future damages. The district court rendered a final judgment in favor of the Wolffs, ordering St. Joseph to pay Stacy $6,887,332.31, and Ray and Sandra Wolff each $645,683.27.[6] The district court also ordered St. Joseph to pay all court costs and the Wolffs' attorney's fees up to $10,000.

On appeal, St. Joseph argues: (1) it is not responsible for Dr. Villafani's conduct in treating Stacy; (2) the district court failed to properly instruct the jury; (3) the district court erroneously admitted evidence of insurance during the trial; and (4) statutory caps on damages should apply in this case.

---

**5.** The jury specifically found that: (1) The cause of Stacy's injury was 85% attributable to the negligence of Dr. Villafani and 15% attributable to the negligence of Suzanne Nash Harris, a nurse caring for Stacy at the time Stacy experienced the complication from her tracheostomy; (2) the negligence of each was a proximate cause of Stacy's injury; (3) St. Joseph and the Foundation were engaged in a joint enterprise and a joint venture; (4) when treating Stacy, Dr. Villafani was: (a) acting as an employee of St. Joseph, the Foundation, and the joint venture of the two entities; (b) acting within the scope of this employment; and (c) providing care to Stacy to benefit and subject to the control of St. Joseph, the Foundation, and the joint venture; and (5) St. Joseph, the Foundation, and the joint venture ratified Dr. Villafani's conduct.

## DISCUSSION

### St Joseph's Liability

St. Joseph contends that it is not responsible for Stacy's injury because: (1) Dr. Villafani was not an employee of St. Joseph while treating Stacy; (2) there is legally or factually insufficient evidence of a joint enterprise or joint venture between St. Joseph and the Foundation; (3) the jury's finding that St. Joseph ratified the conduct of Dr. Villafani was legally or, in the alternative, factually insufficient; and (4) St. Joseph owed no duty to Stacy.

We will first address St. Joseph's assertion that the evidence is insufficient to support the jury's finding that St. Joseph and the Foundation engaged in a joint enterprise in establishing and operating the Integrated Program of which Dr. Villafani was a part when he treated Stacy at Brackenridge. We review such challenges under a sufficiency of the evidence standard of review.[7] In reviewing the legal sufficiency of the evidence, we consider all of the record evidence in a light most favorable to the party in whose favor the verdict has been rendered, and every reasonable inference deducible from the evidence is to be indulged in that party's favor. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998) (citing *Harbin v. Seale*, 461 S.W.2d 591, 592 (Tex.1970)).

---

**6.** The amount of damages assessed by the jury was altered by the district court to reflect St. Joseph's election to take a credit for the amount paid to the Wolffs by the settling defendants and to add prejudgment interest.

**7.** St. Joseph argues that we should determine issues concerning liability *de novo*. We disagree. We review a jury's findings for legal and factual sufficiency of the evidence. *See Westech Eng'g, Inc. v. Clearwater Constructors*, 835 S.W.2d 190, 195 (Tex.App.—Austin 1992, no writ); *Sebesta v. Daniels*, 812 S.W.2d 641, 644 (Tex.App.—Houston [14th Dist.] 1991, writ denied).

We will uphold the jury's finding if there is more than a scintilla of evidence to support it. *See id.; Continental Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995). Thus, if there is any evidence of probative force to support the jury's finding " 'that would enable reasonable and fair-minded people to differ in their conclusions,' " the no-evidence challenge will fail. *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex. 1997) (quoting *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994)); *see ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997) (citing *Southern States Transp., Inc. v. State,* 774 S.W.2d 639, 640 (Tex.1989)).

When reviewing a jury verdict to determine the factual sufficiency of the evidence, we must consider and weigh all of the evidence. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). The appellate court should not substitute its judgment for that of the trier of fact simply because it disagrees with the result;[8] instead, it should set aside the verdict only if it is so clearly wrong as to be manifestly unjust. *See id.*

### Joint Enterprise

■ A joint enterprise, in the context of the law of negligence, is a legal relationship between two or more parties that imposes on each participant the responsibility for the negligent acts of the other while acting in furtherance of their common undertaking. *See Shoemaker v. Estate of Whistler,* 513 S.W.2d 10, 13 (Tex. 1974); *Texas Dep't of Transp. v. Able,* 981 S.W.2d 765, 768 (Tex.App.—Houston [1st Dist.] 1998, pet. granted). The jury found that St. Joseph and the Foundation were engaged in a joint enterprise, that Dr. Villafani was employed by St. Joseph and the Foundation, and that he was acting in furtherance of the mission of both during his treatment of Stacy. St. Joseph does not dispute that Dr. Villafani was an employee of the Foundation. Thus, if the evidence supports the jury's finding that St. Joseph and the Foundation were engaged in a joint enterprise at the time of the injury to Stacy arising from her surgery, St. Joseph is responsible for any negligence of Dr. Villafani.

■ St. Joseph argues that not only is the evidence legally and factually insufficient to support the jury's finding of a joint enterprise between itself and the Foundation, but also that the district court improperly submitted the definition of joint enterprise in his charge to the jury.

Prior to 1974, the doctrine of joint enterprise was more broadly applied in Texas than it is today. Its application covered enterprises having a personal purpose as well as those related to a commercial or business purpose. *See Shoemaker,* 513 S.W.2d at 15. In *Shoemaker,* the supreme court adopted the characterization of joint enterprise set forth in the Restatement of Torts:

> The elements which are essential to a joint enterprise are commonly stated to be four: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control. Whether these elements exist is frequently a question for the jury, under proper direction from the court.

*Id.* at 16–17 (quoting Restatement (Second) of Torts § 491 cmt. c (1965)). The court then specifically noted that it was "limiting the application of the doctrine to an enterprise having a *business or pecuniary purpose.*" *Id.* at 17 (emphasis added).

In the definition submitted to the jury, the district court employed the supreme

---

**8.** *See Peco Constr. Co. v. Guajardo,* 919 S.W.2d 736, 739 (Tex.App.—San Antonio 1996, writ denied).

court's language, as opposed to that of the Restatement, in expressing the third required element.[9] St. Joseph argues that this was error because "common business or pecuniary interest" is broader in meaning than "community of pecuniary interest." We disagree. The supreme court was not attempting to define how the participants in the enterprise would divide its fruits or share its losses.[10] The court sought simply to restrict the application of the doctrine of joint enterprise to business relationships: "[W]e will henceforth be avoiding the imposition of a basically commercial concept upon relationships not having this characteristic." *Id.*

■ Trial courts are charged with submitting "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex.R. Civ. P. 277. In so doing, the court "has wide discretion to determine the sufficiency of definitions and instructions." *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex. 1995). As we have previously stated, "The sufficiency of explanations and definitions *as to form* is largely in the discretion of the [t]rial [c]ourt and the test is the reasonable clearness of the definitions to enable the jurors to understand the word or phrase." *Gulf Ins. Co. v. Vela*, 361 S.W.2d 904, 906 (Tex.Civ.App.—Austin 1962, writ ref'd n.r.e.) (emphasis added). *Plainsman* would indicate, and we have held, that the form of the definitions submitted to the jury rests within the discretion of the trial court, and "the applicable standard of review is clear abuse of discretion." *Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 902 S.W.2d 488, 497 (Tex. App.—Austin 1993), *rev'd on other grounds*, 908 S.W.2d 415 (Tex.1995). Here, however, St. Joseph does not object to the *form* of the definition submitted, but

asserts that by injecting "common business" into the definition of joint enterprise the district court misstated the law. It has been suggested that whether a definition properly defines the terms it uses or correctly states the law should be reviewed *de novo*. *See* W. Wendell Hall, *Standards of Review in Texas*, 29 St. Mary's L.J. 351, 449 (1998). It is appropriate to review the substance of a submitted definition *de novo*. For instance, we apply that test when reviewing a trial court's legal conclusions. *Circle C Child Dev. Ctr., Inc. v. Travis Cent. Appraisal Dist.*, 981 S.W.2d 483, 485 (Tex.App.—Austin 1998, no pet.); *Piazza v. City of Granger*, 909 S.W.2d 529, 532 (Tex.App.—Austin 1995, no writ). We therefore will examine the district court's definition *de novo*.

■ The essence of a joint enterprise, indeed what distinguishes it from a joint venture, is that the parties to the enterprise must have a commercial interest. *See Shoemaker*, 513 S.W.2d at 17. Since *Shoemaker*, the supreme court has expressed this interest as "a common pecuniary interest," *see Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 718 (Tex.1995), and "a community of pecuniary interest." *See Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex.1995). As previously observed, the *Shoemaker* court approved the language of the Restatement, "a community of pecuniary interest in [the common purpose of the enterprise], among the members," but then noted that this only meant that the enterprise have a "common business or pecuniary purpose." *Shoemaker*, 513 S.W.2d at 17.

In submitting the definition as he did, the district court actually narrowed or restricted the consideration of the term "pecuniary" to a business context. Common

---

9. Question No. 3 submitted to the jury states in part, "A 'joint enterprise' exists if the persons or entities concerned have ... (3) a common business or pecuniary interest...."

10. *See Texas Dep't of Transp. v. Able*, 981 S.W.2d 765, 769 (Tex.App.—Houston [1st

Dist.] 1998, pet. granted) (citing *Shoemaker*, 513 S.W.2d at 16–17) ("elements required to establish a joint enterprise, as distinguished from a joint venture, do not require proof of the sharing of profits and losses").

definitions of "pecuniary" include, "consisting of money *or that which can be valued in money*," *Black's Law Dictionary* 1131 (6th ed.1990) (emphasis added), "consisting of *or pertaining to money*," *American Heritage Dictionary* 965 (William Morris ed., 1973) (emphasis added), and "of or relating to money," *Webster's Third New International Dictionary* 1663 (Philip B. Gove ed., 1986). "Pecuniary" is a general term often considered a synonym of "financial." *See Roget's II The New Thesaurus* 718 (The American Heritage Dictionary ed., 1988). Texas courts have used the term in a broad context encompassing personal as well as business or commercial implications. " 'Pecuniary benefits' encompass those benefits, including money, *that can be reasonably estimated in money*, such as labor, services, kindness and attention of a child to its parents." *Borak v. Bridge*, 524 S.W.2d 773, 776 (Tex.Civ. App.—Corpus Christi 1975, writ ref'd n.r.e.) (emphasis added) (citing *Houston Elec. Co. v. Flattery*, 217 S.W. 950 (Tex. Civ.App.—Galveston 1919, no writ)); *General Motors Corp. v. Grizzle*, 642 S.W.2d 837, 845 (Tex.App.—Waco 1982, no writ).[11]

The district court's definition made it clear to the jury that it could find that St. Joseph and the Foundation were engaged in a joint enterprise *only* if it found that the nature of their endeavor was business or commercial, as opposed to personal in nature. This is not only consistent with *Shoemaker*, but with common custom and usage among trial courts and practitioners. *See* 1 State Bar of Texas, *Texas Pattern Jury Charges*, PJC 7.11 (1998) (suggested definition of joint enterprise same as that submitted by district court here).

We hold that the district court, as a matter of law, properly defined joint enterprise in charging the jury, and now consider whether the evidence at trial sufficiently supports the jury's finding that St. Joseph and the Foundation were engaged in a joint enterprise.

## A. Common Purpose

■ A joint enterprise requires that the two entities involved have a common purpose. *See Shoemaker*, 513 S.W.2d at 16–17. St. Joseph sponsors a surgical residency program, and the Foundation renders physician services to patients through surgical residents. Prior to establishing the Integrated Program, St. Joseph could not provide the training and experience to its surgical residents in trauma, emergency surgery, and critical care necessary to house an accredited surgical residency program. To satisfy their mutual desire to provide extensive training through patient care, St. Joseph and the Foundation entered into an agreement to establish the Integrated Program ("Integrated Program Agreement").[12] The Integrated Program Agreement explains the purpose of the program as St. Joseph's wish to "provide extensive experience in general surgery for [its] surgical residents in training," and the Foundation's desire to obtain "the services of postdoctoral surgical residents to assure the availability of qualified surgeons in the future."

In addition to the stated purpose expressed in the Integrated Program Agreement, physicians and directors from St. Joseph and the Foundation testified as to the purpose behind the program. The Foundation's chief executive officer and its director of the Integrated Program both testified at trial that the "common mission"

---

**11.** *See also Goldstein v. State*, 803 S.W.2d 777, 791 (Tex.App.—Dallas 1991, pet. ref'd) (use of "pecuniary" in context of criminal prosecution consistent with dictionary definitions).

**12.** The Integrated Program Agreement is a detailed written contract between St. Joseph and the Foundation that describes the duties

and obligations of each with regard to the Integrated Program. It is thus undisputed that there exists an express agreement with respect to the enterprise or endeavor between St. Joseph and the Foundation satisfying the first requirement of a joint enterprise. *See Shoemaker*, 513 S.W.2d at 16–17; p. 585, *supra.*

and "core purpose" of the Integrated Program between St. Joseph and the Foundation was to provide medical education and training to residents. The director of medical education at St. Joseph stated that St. Joseph and the Foundation share a common mission and purpose of medical education, which involves patient care. Indeed, patient care is the vehicle that provides the medical education and training. Patient care on the one hand and medical education and training on the other are, both in practice and by agreement, in fact integrated. The record before us amply reflects that St. Joseph and the Foundation, when forming the Integrated Program, had a common purpose: to provide medical training through patient care. The second element essential to a joint enterprise, therefore, has clearly been satisfied.

St. Joseph, however, urges that the common purpose must relate specifically *to providing patient care to Stacy Wolff* and not to the broader purpose of providing medical training to residents. First, we note that the admitted purpose for creating the Integrated Program between St. Joseph and the Foundation was not only to provide medical training but to provide such experience through *patient care*. The director of medical education at St. Joseph testified that patients are essential to train residents in the Integrated Program. Specific patient care is subsumed within the purpose of medical education and training contemplated by the Integrated Program Agreement. We disagree with St. Joseph's assertion that specific patient treatment can be separated from the overall goal of medical education to defeat the obvious common purpose of St. Joseph and the Foundation in participating in the Integrated Program. Because the evidence establishes that St. Joseph and the Foundation did have the same goal, to train surgical residents through patient care, we find St. Joseph's argument to be without merit.

**B.** *Common Business or Pecuniary Interest*

For there to be a joint enterprise, the participants must share a common business or pecuniary interest. *See Shoemaker,* 513 S.W.2d at 16–17. The record reflects that St. Joseph and the Foundation had an interest in creating a graduate surgical-residency program in order to gain an accredited program and the distinction and benefits that they hoped would follow. The jury could have reasonably assumed from testimony related to these interests and the Integrated Program Agreement itself that the two entities formed the Integrated Program to avoid duplication and to reduce each party's operational and maintenance costs. *See Able,* 981 S.W.2d at 769. As a result of the Integrated Program, both entities did in fact benefit from the prestige that comes with housing an accredited program[13] and were given the opportunity to recruit qualified physicians and bolster their other residency programs; doctors were more willing to treat patients at St. Joseph due to the availability of "extensively" trained residents; St. Joseph received higher medicare payments; and the Foundation was able to reach its overall mission of providing physician services through graduate medical education.

The record further reflects that St. Joseph and the Foundation share to some extent in the financial benefits and costs related to the Integrated Program. St. Joseph pays its residents an annual stipend. The Foundation bills patients for the services of Integrated Program residents and then gives a portion of these proceeds to St. Joseph for the residents' services. The Foundation also pays the residents assigned to the program a housing allowance. The record when viewed in the light most favorable to the jury's verdict sufficiently establishes that St. Joseph

---

**13.** St. Joseph concedes that, along with the Foundation, it procured an accredited surgi- cal program and benefitted from the prestige that resulted.

and the Foundation have a common business or pecuniary interest in the Integrated Program that at a minimum can be reasonably estimated in money.[14]

St. Joseph relies on *Ely v. General Motors Corp.*, 927 S.W.2d 774 (Tex.App.—Texarkana 1996, writ denied) to support its proposition that a common pecuniary interest must be more than a generally shared economic interest and implies a sharing of common finances between participants to the enterprise. *Ely* does not go so far. *Ely*, relying on *Shoemaker*, merely confirms that "[t]he community of pecuniary interest required is to be in the common purpose of the enterprise." *Ely*, 927 S.W.2d at 779. The court neither expresses nor implies that a sharing of common finances is a requisite of a joint enterprise. *Ely* does no more than find that "[w]hen one party is selling vehicles wholesale to another to sell retail, there is not a pecuniary interest in a common enterprise." *Id.* As St. Joseph's and the Foundation's common interest in establishing an accredited surgical residency program flows directly from their purpose in establishing the Integrated Program, to provide medical training through patient care, we find no conflict with *Ely*.

While we disagree with its interpretation of *Ely*, we will examine St. Joseph's assertions to determine whether there is factually sufficient evidence to support this joint-enterprise element. St. Joseph places particular reliance on evidence that fees billed for resident services at Brackenridge were the Foundation's sole property. The record, however, also contains testimony from the Foundation's chief executive officer and its director of surgical education that these profits were shared with St. Joseph.

St. Joseph relies further on evidence that it loses about $1 million a year while the Foundation makes a small profit from the program. However, the record is unclear as to how much St. Joseph lost, if

any, from the Integrated Program alone. The evidence instead indicates that St. Joseph's surgical program in its entirety, including its library and training program in Houston, has a $1 million deficit. Moreover, the evidence establishes that St. Joseph benefitted from this accredited program by attracting new residents and staff physicians and collecting higher medicare payments without having to bear the expense of housing an accredited surgical program. Having conflicting evidence from both sides, the jury's finding is not so "contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176. Further, the jury could have concluded from the Integrated Program Agreement alone that St. Joseph and the Foundation each had a definite pecuniary interest of its own that motivated its participation in the enterprise. *See Able*, 981 S.W.2d at 769.

C. *Equal Right to Direct and Control the Enterprise*

The participants in a joint enterprise must also have an equal right to direct and control that enterprise. *See Shoemaker*, 513 S.W.2d at 16–17. Each entity must have an authoritative voice or some voice and right to be heard. *See id.* at 16–17. In this case, the director of medical education stated outright that St. Joseph retains control of its residents, and the director of the Integrated Program for the Foundation agreed that both St. Joseph and the Foundation have an equal right to direct and control portions of the Integrated Program. Along with this testimony, the Integrated Program Agreement provides that the Foundation must consult St. Joseph on all academic aspects of the program, and St. Joseph must review and approve the Foundation's teaching staff and the training assignments given to the residents.

In response to St. Joseph's assertion that its control is limited to academic portions of the program, the Integrated Pro-

---

**14.** *See* discussion p. 587, *supra.*

gram Agreement and the structure of the program show otherwise. Specifically, the agreement provides that the Foundation must consult with and obtain approval of the academic chief of general surgery at St. Joseph about the details of *medical tasks* performed by the residents. Moreover, as part of the Integrated Program, St. Joseph assigns its chief resident to participate in the program. The chief resident then acts as the junior residents' "boss," setting the daily schedule for the other residents to follow and supervising them while providing medical care to patients at Brackenridge. Viewing this evidence in the light most favorable to the jury's findings, the record indicates that St. Joseph had sufficient control to establish a joint enterprise.

St. Joseph urges, however, that this case is similar to two cases in which courts found that there was no evidence to show an equal right to control and direct the enterprise. *See Triplex Communications, Inc. v. Riley,* 900 S.W.2d 716 (Tex.1995); *Drennan v. Community Health Inv. Corp.,* 905 S.W.2d 811 (Tex.App.—Amarillo 1995, writ denied). We disagree.

Initially, we observe that St. Joseph's reliance on *Drennan* is misplaced. In *Drennan,* the court of appeals analyzed allegations of a *joint enterprise* by mistakenly applying the elements of a *joint venture.* In its analysis of the relationship of the parties before it, the *Drennan* court erroneously stated:

> A joint enterprise consists of four elements: (1) a community of interest in the venture; (2) an agreement to share profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise.

*Drennan,* 905 S.W.2d at 822 (citing *Ayco Dev. Corp. v. G.E.T. Serv. Co.,* 616 S.W.2d 184, 186 (Tex.1981)). These are the elements of a joint venture and have no application to a joint enterprise. *See Ayco,* 616 S.W.2d at 186. Thus, *Drennan* is not applicable to the instant case.

In *Triplex,* a radio station collaborated with a local night club to sponsor "ladies night" each Thursday. During one such event, the club served two patrons, one underage, an "excessive amount" of alcohol. Both patrons were later involved in automobile accidents caused by their intoxication. Two police officers investigating the first accident were struck by the car of the second patron and brought suit against the club and radio station in part under a joint-enterprise theory. The supreme court assumed *arguendo* that the first three prongs of a joint enterprise were present. *See Triplex,* 900 S.W.2d at 718. The court then found no evidence that the radio station had a right of control that would give rise to joint enterprise liability. *See id.* at 718–19. While the radio station might make suggestions that the club could accept or reject, it had no contractual right to control the provision of alcohol. *See id.*

Here, St. Joseph had much more than a general right to make suggestions that the Foundation, in its sole discretion, could accept or reject. Residency programs naturally provide for some amount of control as they are established to train recently graduated doctors in special fields through patient care "with *guidance and supervision.*" American Medical Association, 1993–94 Graduate Medical Education Directory 9 (1993) (emphasis added). According to the director of medical education at St. Joseph, residents operate under guidelines that are more restrictive than staff physicians, and residency programs exercise the most control over physicians.

In the present case, the record indicates that St. Joseph did maintain control over its residents while providing patient services in the Integrated Program. St. Joseph assigned all residents to participate in the Integrated Program, consulted in the academic aspects of the program, and approved all medical tasks to be performed by the residents. In addition, pursuant to the basic structure of the program, St.

Joseph's chief resident controlled and supervised the residents' patient care while at Brackenridge. Unlike in *Triplex*, St. Joseph did have contractual authority and the right to be heard through the Integrated Program Agreement concerning the "medical tasks performed by the residents" in the Integrated Program.[15] We find, therefore, that this case is factually distinguishable from *Triplex*.

The evidence in this case does establish, as St. Joseph asserts, that the Foundation had direct supervision over residents involved in the Integrated Program, including details related to their patient care. Despite this supervision, however, the record also reflects that St. Joseph had an authoritative voice over the Integrated Program and their residents' actions in the program. Directors of the Integrated Program from St. Joseph and the Foundation testified that both entities had the right to control aspects of the program and the residents. The Integrated Program Agreement expressly makes the Foundation's authority subject to St. Joseph's consultation and approval even in areas involving patient care. And St. Joseph's chief resident supervises and directs residents in the program at Brackenridge. Given that this evidence shows that St. Joseph had some voice and right to be heard, as defined in the jury's charge, the jury's verdict is not clearly wrong and unjust. Indeed, the Restatement of Torts, as adopted by *Shoemaker*, recognizes that a jury will often need to weigh the evidence to determine if the factors of a joint enterprise exist. *See Shoemaker*, 513 S.W.2d at 17. The district court properly charged the jury and the evidence is both

legally and factually sufficient to support the jury's finding. From the evidence it is apparent that the jury could have decided that, based on the Integrated Program Agreement, St. Joseph and the Foundation each retained an equal right to control the program even though one or the other had specific duties with regard to the operation of the program. *See Able*, 981 S.W.2d at 769.

We hold there is legally and factually sufficient evidence to support the jury's finding that St. Joseph and the Foundation were engaged in a joint enterprise. As participants, both St. Joseph and the Foundation are thereby responsible for each other's negligent acts. *See Shoemaker*, 513 S.W.2d at 14; *Able*, 981 S.W.2d at 768.

Therefore, we conclude that St. Joseph is responsible for Dr. Villafani's negligence and overrule St. Joseph's first issue.[16]

*Duty*

■ St. Joseph further argues that it owed no duty to Stacy because she was never a patient at St. Joseph and thus there was no hospital-patient relationship between Stacy and St. Joseph. However, we have held that St. Joseph and the Foundation were engaged in a joint enterprise whereby each participant was responsible for the negligent acts of the other. *See Shoemaker*, 513 S.W.2d at 14. Thus, St. Joseph need not be held directly negligent. Rather, it is Dr. Villafani's negligence, as the Foundation's employee, for which St. Joseph's liability as a participant in the joint enterprise is based. The hospital-patient relationship between St. Jo-

---

**15.** We further distinguish *Triplex* by noting that the radio station and club in that case collaborated on an event that took place one night a week during specific hours of operation, while the Integrated Program was an integral and continuous part of St. Joseph's general surgical residency program.

**16.** Having upheld the jury's finding that St. Joseph and the Foundation were engaged in a joint enterprise, we need not determine whether the evidence sufficiently supports the

jury's findings that St. Joseph and the Foundation were engaged in a joint venture, that Dr. Villafani was St. Joseph's employee, or that St. Joseph ratified Dr. Villafani's conduct. *See Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 668 (Tex.1996) (where jury finds defendant liable on two or more independent theories of recovery and appellate court can uphold such finding on one theory, court need not reach merits of remaining theories).

## 592

seph and Stacy, therefore, is irrelevant in determining St. Joseph's liability to Stacy.

### Jury Charge

St. Joseph complains that the district court failed to properly instruct the jury because the court: (1) failed to submit a question addressing the borrowed-servant doctrine; (2) used improper general language when submitting issues concerning joint enterprise, joint venture, and vicarious liability; and (3) failed to submit a question to determine the percentage of responsibility owed to each of the seven settling parties.[17]

### *Borrowed-Servant Doctrine*

By its second issue, St. Joseph asserts that the district court erred in failing to submit to the jury a question inquiring whether Dr. Villafani was the Foundation's borrowed servant. The borrowed-servant doctrine generally applies when an employee of one employer is temporarily "loaned" to another employer. *See Lara v. Lile,* 828 S.W.2d 536, 538 (Tex.App.—Corpus Christi 1992, writ denied); *Carr v. Carroll Co.,* 646 S.W.2d 561, 563 (Tex.App.—Dallas 1982, writ ref'd n.r.e.). Under these circumstances, the negligence of the employee is attributed to the new employer and the "lending" employer is protected from liability that would normally arise from that employer's right to control its employee. *See Lara,* 828 S.W.2d at 538; *Carr,* 646 S.W.2d at 563. St. Joseph asserts that "even if Dr. Villafani had been employed by St. Joseph Hospital, he would have been a borrowed servant of . . . [the] Foundation while treating Stacy . . ." and thus it is not liable for Dr. Villafani's negligence.

A finding that two entities are engaged in a joint venture generally renders immaterial the borrowed-servant rule. *See Porter v. Puryear,* 258 S.W.2d 182, 188–89 (Tex.Civ.App.—Amarillo 1953, no writ). We hold the same to be true when the parties are engaged in a joint enterprise.

Alleged errors in the jury charge will be deemed reversible only if, when viewing the totality of the circumstances, it probably caused the rendition of an improper judgment. *See* Tex.R.App. P. 44.1(a)(1); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986). Error is generally deemed harmless where a judgment can be supported by the jury's answers to other questions in the charge. *See Hilsher v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 717 S.W.2d 435, 439 (Tex. App.—Houston [14th Dist.] 1986, no writ) ("refusal to submit special issues can be harmless when findings upon issues properly submitted compel judgment which would not have been affected by any finding on the omitted issues and the matter inquired about in the requested issue would not have affected the jury's deliberations on the determinative issue"); *cf. City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) ("Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial."). Thus, assuming without deciding that the district court should have submitted a question concerning the borrowed-servant doctrine, any such error was rendered harmless when the jury found that St. Joseph and the Foundation were engaged in a joint enterprise.

We therefore overrule this issue.

---

17. St. Joseph also complains that the district court erroneously submitted a question on ratification. We need not address this issue, however, as the jury's finding of liability based on joint enterprise renders the submission of ratification to show liability immaterial. *See Ginther v. Taub,* 675 S.W.2d 724, 725 (Tex.1984) (circumventing other issues where jury's verdict can be upheld on independent ground presented at trial); *see also City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995) (submission of improper jury question can be harmless if jury's answers to other questions render improper question immaterial).

### District Court's Use of "On the Occasion in Question"

▆ Next, St. Joseph asserts that the district court erred because he refused to tie the questions submitted to the jury involving joint enterprise, joint venture, ratification, and Dr. Villafani's employment and scope of employment to the specific events that caused Stacy's injury. The district court's questions to the jury restricted their consideration to the parties' status "on the occasion in question." This qualifying phrase, posits St. Joseph, "is vague, and leads to jury misunderstanding and confusion."

▆ We review a trial court's jury charge to determine if the court acted without reference to guiding principles, an abuse of discretion standard of review. *See Connell Chevrolet Co., Inc. v. Leak,* 967 S.W.2d 888, 894 (Tex.App.—Austin 1998, no pet.) (citing *Texas Dep't of Human Servs. v. E.B.,* 802 S.W.2d 647, 649 (Tex.1990)). St. Joseph argues that the jury was allowed to decide the questions "generally and in the abstract, without any specific reference to Stacy Wolff or the events causing her injury." The phrase "on the occasion in question," however, can be plainly construed to mean the event that enabled the Wolffs to bring suit against St. Joseph: Dr. Villafani's treatment of Stacy.[18] *See Upjohn Co. v. Freeman,* 885 S.W.2d 538, 546 n. 7 (Tex.App.—Dallas 1994, writ denied) (plain meaning of term "occurrence in question" is "the event that enables a plaintiff to bring suit against a defendant"). We find no difference between the use of the words "occasion" and "occurrence" in this context.

The use of this language is not new, and courts have approved jury questions that employ it to limit the scope of the jury's inquiry. *See, e.g., Keetch v. Kroger Co.,* 845 S.W.2d 262, 265 n. 2 (Tex.1992) (approving premises liability question using phrase "on the occasion in question"); *Schneider v. Esperanza Transmission Co.,* 744 S.W.2d 595, 596 (Tex.1987) (defining element in negligent entrustment using phrase "on the occasion in question"). In *Wyndham Hotel Co. v. Self,* 893 S.W.2d 630 (Tex.App.—Corpus Christi 1994, writ denied), the court of appeals found that the trial court properly required the jury to consider "the occasion in question" to answer agency questions.[19] *See Wyndham,* 893 S.W.2d at 636–37. We do not agree with St. Joseph that the form of submission of these questions was misleading or confusing to the jury.

Because the language used by the court in the charge employs clear and plain language to resolve the issues contained in the questions, we hold that these questions were properly submitted. *See Connell,* 967 S.W.2d at 894. We overrule this issue.

### Inclusion of Settling Parties

▆ St. Joseph complains that the district court erred by refusing to include a question to apportion the percentage of responsibility of seven of the settling parties.

▆ A trial court shall only submit questions, instructions, or definitions that are raised by the pleadings and the evidence. *See* Tex.R. Civ. P. 278. Among the seven settling parties that St. Joseph contends were wrongly omitted from the charge, St. Joseph, by its second amended pleading, did not allege wrongdoing on the part of five: the Foundation, Dr. Harshaw, the Foundation's surgical director, Stacy's attending physician, and Brackenridge. Thus, pursuant to Rule 278, the district court was not required to include these

---

18. *See* Tex.R. Civ. P. 278 ("A judgment shall not be reversed because of the failure to submit other and various phases or different shades of the same question.").

19. Texas Pattern Jury Charges suggests that questions addressing whether a person is an employee of another person or entity or whether two entities are engaged in a joint enterprise or venture begin with the phrase "On the occasion in question...." *See* 1 State Bar of Texas, Texas Pattern Jury Charges, PJC 7.1, 7.11 (1998).

parties in the charge to assess their responsibility. *See Rehabilitation Facility at Austin, Inc. v. Cooper*, 962 S.W.2d 151, 154 (Tex.App.—Austin 1998, no pet.).

Despite the district court's proper application of Rule 278, St. Joseph urges that the court was nevertheless required to submit the conduct of each of these five parties to the jury pursuant to the Texas Civil Practice and Remedies Code, *see* Tex. Civ. Prac. & Rem.Code Ann. § 33.003 (West 1997),[20] which provides that "[t]he trier of fact, as to each cause of action asserted, shall determine the percentage of responsibility ... with respect to ...:(1) each claimant; (2) each defendant; (3) each settling person...." *Id.* This Court considered this exact contention in *Cooper*, where, applying the rules of statutory construction, we harmonized Rule 278 and section 33.003. *See Cooper*, 962 S.W.2d at 154. Reading section 33.003 in conjunction with Rule 278, we held that "the settling person's liability need be submitted to the jury only if the pleadings and evidence raise the issue of that person's liability." *Id.* As in *Cooper*, because the negligence of these five settling defendants was not alleged by the pleadings, we find the district court did not err in excluding them from the jury charge. *See id.*

St. Joseph finally asserts that the provision that this Court relied on to support our decision in *Cooper*, section 33.002(f) of the Civil Practice and Remedies Code, does not govern this case because it did not become effective until 1995. *See* Tex. Civ. Prac. & Rem.Code Ann. § 33.002(f) (West 1997). We disagree. This Court did not rely on section 33.002(f) in *Cooper* because, similar to the instant case, section 33.002(f) was not in effect at the time of the proceedings at issue in *Cooper*. Instead, after basing our decision solely on Rule 278 and section 33.003, we cited to

the 1995 amendment to "bolster our interpretation" of these two provisions and as evidence of the legislature's original intent in enacting section 33.003. *See Cooper*, 962 S.W.2d at 154. We clearly noted, however, that section 33.002(f) did not apply in *Cooper*. *See id.* Thus, we find this argument to be without merit.

■ The remaining two settling parties, the drivers involved in the car accident, were included in the pleadings and the evidence presented at trial raised questions as to their negligence.[21] Thus, pursuant to Rule 278 and section 33.003, St. Joseph was entitled to a question requiring the jury to determine the responsibility of these two drivers. *See* Tex.R. Civ. P. 278; Tex. Civ. Prac. & Rem.Code Ann. § 33.003 (West 1997).

■ To reverse a judgment based on this error, we must determine that the error "probably caused the rendition of an improper judgment." Tex.R.App. P. 44.1. The purpose of determining the percentage of liability of the settling defendants in a medical-malpractice action, such as this, is to determine whether the statutory liability cap of the non-settling defendants has been exceeded. *See Wynn v. Cohan*, 864 S.W.2d 205, 207 (Tex.App.—Houston [14th Dist.] 1993, writ denied); *see also Sisters of Charity of Incarnate Word v. Dunsmoor*, 832 S.W.2d 112, 117 n. 3 (Tex. App.—Austin 1992, writ denied). However, no statutory liability cap applies in this case.[22] Moreover, the district court instructed the jury to exclude any amount that resulted from the automobile collision when calculating damages, and then later reduced the damages awarded by the jury by the amount already received by the Wolffs from the settling parties, including the drivers involved in the accident. Because damages are not limited in this case

---

20. This section of the Code has since been amended. As the provisions we rely on have not been substantially altered, we will cite the current version of the code for convenience unless otherwise indicated.

21. The Wolffs concede that the negligence attributed to the drivers in the accident was raised by the pleadings and the evidence.

22. *See* p. 596, *infra.*

by statute and were properly calculated to exclude the liability of these two settling defendants, we conclude that any error was harmless.

Therefore, we overrule this issue.

## Evidence of Insurance

▇▇▇ In its third issue, St. Joseph argues that the district court erred in admitting evidence of insurance.[23] While insurance cannot be offered to prove that a person acted negligently, evidence of insurance is admissible "when offered for another issue, such as proof of agency, ownership or control." Tex.R. Evid. 411. The Wolffs pleaded that St. Joseph was responsible for Dr. Villafani's negligence and that Dr. Villafani was an employee of St. Joseph. The district court admitted evidence that St. Joseph provided Dr. Villafani with medical malpractice insurance covering incidents that might occur while he was a surgical resident in the Integrated Program. This evidence was admitted with the limiting instruction, "Evidence that Doctor Villafani was or was not insured against liability is not admissible on the issue of whether he acted negligently. It is admitted solely on the issue of right to control." [24]

▇▇▇ Relying on Rule of Evidence 403, St. Joseph contends that "[t]he harm from admitting evidence of insurance is apparent in this case" because the jury's decision on medical negligence was influenced by the existence of insurance. Otherwise

relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. While evidence of insurance in this case arguably could have influenced the jury's opinion as to St. Joseph's negligence, it also supported the Wolffs' claim that Dr. Villafani was an employee of St. Joseph. The district court, cognizant of the dangers expressed in St. Joseph's objection, limited the jury's consideration of this evidence. The decision to admit evidence is within the trial court's discretion. *See Malone v. Foster*, 977 S.W.2d 562, 564 (Tex.1998); *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985). We cannot say that the district court abused his discretion in admitting evidence of insurance on this limited basis.

We overrule this issue.

## Statutory Caps On Damages

▇▇▇ St. Joseph finally asserts that the district court erred by refusing to impose statutory limits on its liability. Because of this alleged error, St. Joseph first requests this Court to limit its damages pursuant to the Medical Liability and Insurance Improvement Act (the "Act").[25] However, the Texas Supreme Court in *Lucas v. United States*, 757 S.W.2d 687 (Tex.1988) held that this statutory limitation on medical-malpractice damages violates article I, section 13 of the Texas Constitution.[26]

---

**23.** The admission of evidence is a matter committed to the court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex.1995) (citing *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989)). "A trial court abuses its discretion when it acts without regard for any guiding rules or principles." *Id.* at 754.

**24.** St. Joseph argues that proof of insurance is not one of factors listed by the supreme court in *Thompson v. Travelers Indemnity Co.*, 789 S.W.2d 277 (Tex.1990) to determine whether an employer has the right to control the details of the employee's work. *Thompson*, 789 S.W.2d at 278–79. However, the *Thompson* court did not provide an exclusive

list of factors to determine whether a worker is an employee. The court instead provided a list of "[e]xamples of the type of control normally exercised by an employer" to help determine this difficult issue. *Id.* Thus, other evidence may be relevant to demonstrate right to control.

**25.** *See* Tex.Rev.Civ. Stat. Ann. art. 4590i, §§ 1.01–16.02 (West 1999).

**26.** St. Joseph, while admitting that the supreme court declared the statutory cap unconstitutional for common-law claims, urges us to impose the statutory cap so that it can "ask the Texas Supreme Court to overrule *Lucas.*" This we cannot do. The doctrine of

*Lucas,* 757 S.W.2d at 692. Thus, the district court properly refused to cap damages under the Act.

■■■ St. Joseph next argues that it is entitled to statutory limits of liability pursuant to section 312.006 of the Health and Safety Code and the Charitable Immunity and Liability Act of 1987.[27] Both of these provisions, however, apply only to public or nonprofit hospitals or nonhospital organizations. *See* Tex. Health & Safety Code Ann. §§ 312.002, .006(a) (West 1992) (limiting liability for schools established by statute, schools organized as nonprofit corporations, or nonprofit corporations engaged in coordinated medical education); Tex. Civ. Prac. & Rem.Code Ann. §§ 84.005–.006 (West 1997) (liability limited for non-hospital charitable organizations or employees of the same). St. Joseph, a private hospital, does not fall within either of these classes. Therefore, the court again did not err in refusing to limit liability under the foregoing acts.

We overrule St. Joseph's final issue.

## CONCLUSION

Having disposed of all of the issues before us, we affirm the district-court judgment.

*stare decisis* requires us to follow the supreme court when deciding matters of law. *See Swilley v. McCain,* 374 S.W.2d 871, 875 (Tex. 1964) ("After a principle, rule or proposition of law has been squarely decided by the Supreme Court ... the decision is accepted as a binding precedent by the same court or other courts of lower rank when the very point is again presented in a subsequent suit between different parties.").

27. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 84.001–.008 (West 1997 & Supp.1999).