TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-01-00716-CV






N. C. Sturgeon, L.P. and Wilks Masonry Corp., Appellants


v.


Sul Ross State University (Part of the Texas State University System), Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. GN101480, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING






M E M O R A N D U M O P I N I O N



 Appellant N. C. Sturgeon, L.P. entered into a construction contract with appellee Sul
Ross State University, part of the Texas State University System ("the University"). Appellant
Wilks Masonry Corp. was Sturgeon's masonry subcontractor. (1) After disputes arose, the University
first withheld funds and then terminated the contract. Sturgeon sued, alleging breach of contract and
governmental taking. The University filed a plea to the jurisdiction, pleading sovereign immunity
from suit. The district court granted the University's plea and dismissed Sturgeon's lawsuit. 
Sturgeon contends on appeal that (1) the doctrine of "waiver by conduct" is alive and well, (2) its
"takings" claim should not be barred by immunity simply because a contract is involved, and (3) the
district court erroneously rejected evidence at the hearing on the University's plea to the jurisdiction. 
We will affirm.


Waiver by Conduct

 The first issue presented in Sturgeon's brief, filed before the decision was handed
down in Texas Natural Resources Conservation Commission v. IT-Davy, 74 S.W.3d 849 (Tex.
2002), argues that the University waived its immunity from suit by its conduct and cites for support
cases from this Court. See, e.g., Texas Natural Res. Conservation Comm'n v. IT-Davy, 998 S.W.2d
898 (Tex. App.--Austin 1999), rev'd, 74 S.W.3d 849 (Tex. 2002); Little-Tex Insulation Co. v.
General Servs. Comm'n, 997 S.W.2d 358 (Tex. App.--Austin 1999), rev'd, 39 S.W.3d 591 (Tex.
2001). In IT-Davy, however, the supreme court explicitly rejected the waiver by conduct exception
to sovereign immunity. See IT-Davy, 74 S.W.3d at 856-57. In its reply brief, Sturgeon argues that
"the Supreme Court's reasoning in IT-Davy is fundamentally wrong and requires reconsideration." (2) 
It is not for this court to "reconsider" decisions by Texas's highest court. See Swilley v. McCain, 374
S.W.2d 871, 875 (Tex. 1964); St. Joseph Hosp. v. Wolff, 999 S.W.2d 579, 595 n.26 (Tex.
App.--Austin 1999), rev'd on other grounds, 46 Tex. Sup. Ct. J. 142, 2002 Tex. LEXIS 183 (Nov.
11, 2002). We therefore overrule Sturgeon's first issue and hold that the University did not waive
its immunity from suit by its conduct. IT-Davy, 74 S.W.3d at 856-57. 


Governmental Takings

 In its second issue on appeal, Sturgeon contends that the University committed a
governmental taking when it refused to pay the full contract price and terminated Sturgeon from the
project. Sturgeon argues that it has established a prima facie showing that the University acted in
bad faith with regard to the contract and the monies allegedly owed to Sturgeon.


Standard of Review

 Sovereign immunity protects the State and other governmental entities from being
sued for damages. Travis County v. Pelzel & Assocs., Inc., 77 S.W.3d 246, 248 (Tex. 2002). 
Sovereign immunity consists of immunity from liability, which the State waives when it contracts
with a private party, and immunity from suit, which is not waived by the act of entering into a
contract. Id. Generally, a party seeking to sue the State must show that the State's immunity from
suit has been waived by express consent; express consent may be established by statute or legislative
resolution. Id. A party bringing a constitutional takings claim, however, does not have to show a
waiver of sovereign immunity before bringing suit. Texas State Employees Union/CWA Local 6184
A.F.L.C.I.O. v. Texas Workforce Comm'n, 16 S.W.3d 61, 66 (Tex. App.--Austin 2000, no pet.);
Green Int'l, Inc. v. State, 877 S.W.2d 428, 433 (Tex. App.--Austin 1994, writ dism'd). "A
constitutional taking claim rests on the idea that, although the state has the right to take, damage, or
use, to the exclusion of the private owner, any property it needs to fulfill a public use, the state must
pay just compensation to the property owner." Green Int'l, 877 S.W.2d at 433. A party seeking to
recover under a takings claim must establish that the State (1) intentionally acted in a manner that
(2) resulted in the "taking" of that property (3) for public use. Id. at 434. It is not enough to show
negligence under the first prong; the party must show an intent to take, or at least an intent to
perform the act that caused the harm. Id.

 In a contractual situation, if the State acts "within the procedures outlined in the
contract for the withholding of materials and equipment," there is no intent to take. Id. Likewise,
there is no intent to take if the State acts "within a color of right to take or withhold property in a
contractual situation." Id. As long as the State has a good faith belief that it is justified in
withholding property or payment due to disagreements over payments or contractual performance,
it acts within the color of right, even if it believes the other party is due the withheld payment or
property. Id. Further, the party seeking to prevail under a takings claim must show that the State's
possession of the property was without its consent, and if the party voluntarily enters into and
delivers materials to the State under a contract, the party consents to the State's possession of the
materials. Id. at 435. A proper inquiry into a takings claim requires an analysis of the State's intent
to take and the complaining party's consent. Id. at 436. An intentional tort, such as fraudulent
inducement, is not a proper exercise of State authority, and an unauthorized or unlawful taking is a
tort, not a compensable taking. Firemen's Ins. Co. v. Board of Regents of Univ. of Tex. Sys., 909
S.W.2d 540, 543-44 (Tex. App.--Austin 1995), overruled in part on other grounds by Bland Indep.
Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000).

 We review a trial court's decision on a plea to the jurisdiction de novo. City of San
Angelo v. Smith, 69 S.W.3d 303, 305 (Tex. App.--Austin 2002, pet. denied). If the plaintiff's
petition does not on its face affirmatively demonstrate a lack of jurisdiction, the trial court should
liberally construe the plaintiff's allegations in favor of jurisdiction. Texas Ass'n of Bus. v. Texas Air
Control Bd., 852 S.W.2d 440, 446 (Tex. 1993); Peek v. Equipment Serv. Co., 779 S.W.2d 802, 804
(Tex. 1989); Smith, 69 S.W.3d at 305-06. In deciding a plea to the jurisdiction, a trial court is not
confined solely to the pleadings, but may consider evidence and must do so when necessary to
resolve the jurisdictional issue raised. Blue, 34 S.W.3d at 554-55; Smith, 69 S.W.3d at 306. Unless
a defendant pleads and proves that the plaintiff's factual allegations were made fraudulently in an
attempt to confer trial court jurisdiction, we will take the plaintiff's allegations of fact as true. Smith,
69 S.W.3d at 306. The University does not allege fraudulent pleading on Sturgeon's part; therefore,
we will construe Sturgeon's factual allegations in favor of jurisdiction.

 Although we take Sturgeon's pleaded facts as true, we are not bound by its legal
conclusions. See Martinez v. Hardy, 864 S.W.2d 767, 770 (Tex. App.--Houston [14th Dist.] 1993,
no writ) (parties may stipulate to facts but not to legal conclusions to be drawn from those facts). 
Mere conclusory allegations of bad faith do not constitute proof of bad faith. See Mercer v. Daoran
Corp., 676 S.W.2d 580, 583 (Tex. 1984) ("A legal conclusion in an affidavit is insufficient to raise
an issue of fact . . . or to establish the existence of a fact in support of a motion for summary
judgment."); Murillo v. Garza, 904 S.W.2d 688, 692 (Tex. App.--San Antonio 1995, writ denied)
(in affidavit seeking to establish good faith, "[i]t is not sufficient to simply file a conclusory
statement echoing the language of the supreme court test"); Citizens Ass'n for Sound Energy v. Boltz,
886 S.W.2d 283, 289-90 (Tex. App.--Amarillo 1994, writ denied) (conclusory statements as to
existence of bad faith or improper purpose do not raise fact issue; specific facts showing improper
motive must be alleged). If an allegation of bad faith in a sworn affidavit is insufficient to raise a
fact issue as to the improper motive behind a party's actions, we believe such an allegation made in
an unsworn pleading is similarly insufficient. Mercer, 676 S.W.2d at 583; Murillo, 904 S.W.2d at
692; Boltz, 886 S.W.2d at 289-90.


Factual Allegations and Background

 In July 1997, Sturgeon contracted with the University to build a new University
Center. In 1998, the University complained about the quality of the masonry work and demanded
that the masonry be torn down and rebuilt. Sturgeon complied, feeling that it had no choice because
the University was withholding funds. In late 1999, the University charged Sturgeon for delay in the
Center's completion and withheld more than $700,000. In January 2000, the Center was completed,
and "the University accepted full performance and the benefits of Sturgeon's work without releasing
full payment." In March 2000, the University "terminated" Sturgeon from the project; Sturgeon
alleges that the work was completed and the only work that remained was "corrective work for items
completed and previously accepted." The University then assumed Sturgeon's subcontracts and
ordered extra work.

 The specifications and terms of the contract contain the following relevant provisions:



4.1.3 The Owner's representative, and the Architect/Engineer with the Owner's
consent, shall interpret the Contract requirements and have the authority to
reject work performed by the Contractor, which in the opinion of the Owner's
representative or the Architect/Engineer does not meet the requirements of
the Contract and to order such work removed and replaced in accordance
with paragraph 5.11.

. . . .

4.4.2 Termination by Owner. If the Owner determines that the Contractor . . .
persistently performs substandard work . . . or fails to so prosecute the work
as to insure its completion, within the time, or any extension thereof,
specified in this contract, then the Owner may, without prejudice to any right
or remedy and after giving the Contractor and his surety, if any, ten (10) days
written notice, terminate the employment of the Contractor and take
possession of the site and of all materials, equipment, tools, construction
equipment and machinery thereon owned by the Contractor. Should the
surety fail to respond within fifteen (15) days following such notice and
pursue completion of the work with diligence acceptable to the Owner, the
Owner may arrange for completion of the Work and deduct the cost thereof
from the unpaid Contract sum remaining . . . .

. . . .

5.11 Removal of Defective Work: The Owner's representatives and the
Architect/Engineer shall interpret the Contract requirements and shall be the
final judge of the acceptability of the Work under the Contract Documents. 
If any materials furnished under this Contract are condemned by the Owner
and/or Architect/Engineer, the Contractor shall, after having received notice
from the Owner and/or Architect/Engineer to that effect, proceed to remove
from the grounds or buildings all condemned materials, whether worked or
unworked, and to take down all portions of the Work which the Owner and/or
Architect/Engineer shall by like written notice condemn as unsound or
improper or as in any way failing to conform to the Drawings and
Specifications, and shall make good all work damaged or destroyed thereby.

 5.11.1 The Contractor shall, without charge, replace any material or correct
any workmanship found by the Owner or Architect/Engineer not to
conform to the contract requirements, unless in the public interest the
Owner consents in writing to accept such material or workmanship
with an appropriate adjustment in the contract price. The Contractor
shall promptly correct all Work rejected by the Owner or
Architect/Engineer as defective or as failing to conform to the
Contract Documents whether observed before or after the Date of
Substantial Completion or final inspection and acceptance and
whether or not fabricated, installed or completed. The Contractor
shall bear all costs of correcting such rejected Work.

 5.11.2 If the Contractor does not promptly replace rejected material or
correct rejected workmanship, the Owner may, 1) by contract or
otherwise, replace such material or correct such workmanship and
charge the cost thereof to the Contractor, or 2) terminate the
Contractor's employment in accordance with paragraph 4.4,
CONTRACT TERMINATION.

. . . .

 5.13.2 The Architect/Engineer shall be the final judge of whether a proposed
substitution meets or exceeds the characteristics of a specified item
and decisions of the Architect/Engineer relative to the equality of
items proposed as substitutes for specified items shall be final and
conclusive.

. . . .

7.2.3 The Owner may withhold [progress payments] to such extent as may be
necessary to protect the Owner from loss on account of:

 .1 Defective work not remedied.

 . . . .

 .3 Failure to maintain scheduled progress.

 . . . .

 .5 Persistent failure to carry out the work in accordance with the
Contract Documents.


 In its first amended petition, Sturgeon brought claims for breach of contract and
governmental taking. (3) With regard to its takings claim, Sturgeon alleged:


The University intentionally performed acts that resulted in a taking of Sturgeon's
property and Wilks' property for public use. First, in bad faith and in complete
disregard of the contract, facts, and expert opinion, the University rejected the
masonry work and held Sturgeon hostage, as Sturgeon was unable to terminate the
contract as a result of the University's breach. Thereafter, work performed was
neither consensual nor performed under the contract--it was forced labor. Second,
the University acted in bad faith and in complete disregard of the contract by
withholding money on several occasions, requiring other extra work and re-work of
accepted items. This was not a bona fide dispute about its rights under its contract
because the University informed Sturgeon that it was not bound by the terms of its
contract and was not following the contract . . . . Third, the University appropriated
Sturgeon's subcontracts and secured extra work from subcontractors without paying
Sturgeon for the funds due these subcontractors. Now, however, the subcontractors
are suing Sturgeon for payment.


. . . .


The University was not acting under any colorable contract right. It knew that
Sturgeon was not required to provide the materials and labor in question under any
contract, yet the University coerced Sturgeon into providing those materials and labor
for the public benefit outside of any contractual obligation. Further, it prevented
Sturgeon from exercising its termination rights. Finally, it informed Sturgeon that
it did not intend to follow the contract.



 In its original answer and plea to the jurisdiction, the University argued that all of its
allegedly wrongful acts were "covered by the contract between the parties," and thus, the University
lacked the intent to commit a taking. The University argued that it acted under provisions of the
contract allowing it to "reject defective work and demand that it be removed and replaced" and
giving it the right to "terminate the contract for numerous reasons, including persistently substandard
work." After Sturgeon filed its amended petition, adding a breach of contract claim, the University
filed a supplemental plea to the jurisdiction, in which the University argued that Sturgeon had not
established an express waiver of sovereign immunity for Sturgeon's breach of contract claim. The
University reiterated its position that it acted under colorable contract rights and thus lacked the
required intent to commit a taking, saying that all of its allegedly wrongful acts "arose from [the
parties'] contract and are a contract dispute. In fact, all of the alleged wrongful acts form the basis
of a breach of contract claim in the amended petition."


Discussion

 Taking Sturgeon's allegations of fact as true but disregarding its conclusory legal
statements of bad faith (4) or knowing and wrongful breach of contract, it is apparent that the true
dispute is whether the brick work was in fact defective--Sturgeon urges that it was not and that the
University in bad faith rejected adequate work and demanded extensive reworking of the
masonry--and whether the University rightly or wrongly withheld full payment for Sturgeon's work
on the project. These disputes are inherently related to the provisions of the contract. In fact, in its
reply brief Sturgeon states that "[l]itigants who disagree about whether work is an 'extra,' or whether
work was 'satisfactory', [sic] etc., would not have a takings claim." The evidence and pleadings in
this cause show that the litigants had exactly that kind of disagreement. Attempting to evade the
reach of sovereign immunity by casting the dispute in terms of a takings claim does not change the
inherent character of the contract dispute, and a party suing for breach of contract must obtain an
express waiver of the State agency's immunity from suit. See Pelzel & Assocs., 77 S.W.3d at 248.

 The University's pleadings indicate that it believed it was acting under its contractual
rights (1) to reject work it considered defective and demand its replacement, and (2) to take over the
contract when Sturgeon performed "persistently substandard work." Therefore, the University
lacked the requisite intent to take Sturgeon's property. See Green Int'l, 877 S.W.2d at 434. Further,
Sturgeon voluntarily entered into the contract; thus, it consented to the University's possession of
the property, which negates another prong of the takings test. Id. at 435. We hold that Sturgeon's
pleadings and evidence establish that its dispute with the University is a contract claim, not a takings
claim. We further hold that even if we analyze the claim under the takings doctrine, the University
lacked an intent to take and Sturgeon consented to the University's possession of the disputed
property. (5)

 The trial court did not err in granting the University's plea to the jurisdiction and
dismissing Sturgeon's contract claim cloaked in takings-claim language. We overrule Sturgeon's 
second issue on appeal.


Did the Trial Court Err in Refusing to Admit Sturgeon's Evidence?

 Sturgeon sought to introduce documentary evidence to support its defense to the
University's plea to the jurisdiction, but the trial court refused to admit the evidence. In its third
issue, Sturgeon urges that the trial court erred in excluding the evidence and that its exclusion was
probably harmful because the evidence shows that Sturgeon's allegations "were not simply to
characterize a breach of contract claim as something more." We disagree. 

 We have reviewed the evidence Sturgeon sought to introduce, which consists of: the
affidavit of N. Charles Sturgeon, president of N.C. Sturgeon, L.P.; letters written by Sturgeon's
attorney to the University and letters written by the University; a December 1999 "analysis of
contract funds" showing that there was $421,442.31 of "payments pending," $356,652.31 "retained"
and included in the pending amount, and $200,000.00 "unearned"; a voided check, dated December
20, 1999, from the University to Sturgeon for $421,442.31; and portions of the construction contract.

 The funds analysis, cancelled check, and contract are cumulative of factual allegations
made by both parties, and it was not error to refuse to consider them. As for Mr. Sturgeon's
affidavit, he essentially restates the factual and legal allegations made in Sturgeon's pleadings. He
avers that "Sturgeon fully performed its obligations under the Contract--through final
completion--before being 'terminated' from the project." He further states that the University
"breached its obligations" by refusing to fully pay Sturgeon, "wrongfully terminat[ed]" Sturgeon,
"repeatedly and knowingly acted in derogation of its contractual rights and obligations," and acted
in violation of contractual procedures. Likewise, the letters from Sturgeon's attorney to the
University argue the same factual allegations and make the same legal conclusions as do Sturgeon's
pleadings. The letters list the work that Sturgeon urges remained to be done and attempts to explain
why many of the problems were not Sturgeon's responsibility. However, words and phrases such
as "wrongfully," "breached its [contractual] obligations," or "knowingly," are legal conclusions not
factual allegations, and are not evidence of bad faith conduct. Mr. Sturgeon's affidavit and
Sturgeon's attorney's letters do not add material factual allegations beyond those set out in the
pleadings and Sturgeon was not harmed by their exclusion.

 Finally, the letters from the University, if considered by the trial court, would not have
helped Sturgeon's argument. The University's December 1998 letter states that Sturgeon's masonry
consultant's report "only substantiates the previous conclusions reached by [the University] that the
masonry work as now installed is unacceptable." The letter states that the masonry work had to be
corrected, and that, although the University believed that such correction would require "total
removal," it would "reserve judgment until the corrections are made." The University's March 2000
letter to Sturgeon's surety is a formal declaration that the University was terminating Sturgeon for
default under the contract. The letter recites that the University had earlier notified the surety of
Sturgeon's difficulties with the project and discussed with the surety how "to get the project
completed without terminating or declaring N.C. Sturgeon, Inc. in default on the contract." The
letter goes on to state that in March 2000, it was apparent to the University that Sturgeon "has no
intentions of completing the remaining items on the project or does not know how to complete
them." The letter sets out in some detail a number of the problems the University had with the
construction. The University's letters only further establish that this was a bona fide dispute over
Sturgeon's performance and rights under the contract. The letters do not aid Sturgeon in establishing
bad faith or misconduct by the University. Their exclusion was not "probably harmful" to Sturgeon
and do not demonstrate "that the university's conduct qualified as any unconstitutional taking of
property." We overrule Sturgeon's third issue on appeal.



Conclusion

 Having overruled Sturgeon's appellate issues, we affirm the trial court's judgment
dismissing Sturgeon's lawsuit for want of jurisdiction.



 __________________________________________

 David Puryear, Justice

Before Justices Kidd, Patterson and Puryear

Affirmed

Filed: January 16, 2003
1. We will refer to appellants collectively as "Sturgeon."
2. In its reply brief, Sturgeon also argues that the waiver by conduct exception was revived
by legislation, referring to the Legislature's 2001 amendments to Chapter 2260 of the Government
Code, which sets out procedures to be followed in contract disputes with the State. See Tex. Gov't
Code Ann. §§ 2260.001-.108 (West 2000 & Supp. 2003). When Chapter 2260 was first enacted in
1999, it applied to all disputes pending or arising after September 1, 1999. See Act of May 30, 1999,
76th Leg., R.S., ch. 1352, § 9, 1999 Tex. Gen. Laws 4578, 4584. In 2001, Chapter 2260 was
amended to provide that disputes related to contracts entered into on or before August 30, 1999 were
governed by the law in effect at the time the contract was made. See Tex. Gov't Code Ann.
§ 2260.002(2) (West Supp. 2003). Sturgeon argues that this amendment "revived" the waiver by
conduct exception because "under that law the doctrine of waiver-by-conduct was recognized." As
discussed above, the supreme court expressly rejected the waiver by conduct exception, and we are
constrained to follow precedent.
3. Sturgeon did not raise a breach of contract claim in its original petition.
4. Sturgeon does not allege that the University committed fraudulent inducement or any other
tort, which would negate a takings claim. See Firemen's Ins. Co. v. Board of Regents of Univ. of
Tex. Sys., 909 S.W.2d 540, 543 (Tex. App.--Austin 1995), overruled in part on other grounds by
Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000). To the contrary, Sturgeon carefully
points out that it is not suing for a "bad faith" intentional tort, but instead argues that "'bad faith'
conduct by a state agency destroys the defense that it has 'no intent' to take property."
5. In its reply brief, Sturgeon argues that it should be allowed to continue with its case "to
determine whether evidence of bad faith conduct exists," and asks for a bifurcated trial in which the
fact finder would determine whether the University acted "with conscious disregard of its contractual
obligations." Such a trial would eviscerate the University's sovereign immunity against suit.