

In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-12-00328-CV
_____

JANET BONTKE, INDIVIDUALLY AND AS GUARDIAN OF THE ESTATE AND
PERSON OF NOLAN BONTKE, A WARD, APPELLANT

V.

CARGILL MEAT LOGISTICS SOLUTION, INC., CARGILL MEAT SOLUTIONS
CORPORATION, AND TULIA FEED LOT, INC., APPELLEES

On Appeal from the 64th District Court
Swisher County, Texas
Trial Court No. A-11598-10-06, Honorable Robert W. Kinkaid Jr., Presiding

April 14, 2014

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Janet Bontke, individually and as guardian of the estate and person of Nolan

Bontke (Bontke), appeals from a judgment denying her recovery against Cargill Meat

Logistics Solution, Inc. (Cargill Logistics) and Cargill Meat Solutions Corporation (jointly

referred to as Cargill) and Tulia Feed Lot, Inc. (the Feedlot).  The suit arose from

injuries suffered by Nolan Bontke after attempting to load an injured steer into a cattle

trailer at the Tulia Feed Lot. It was not the injured steer that caused his injuries but rather a healthy animal used to induce the injured animal into the trailer. It became agitated, ran down a shoot towards an unlocked gate behind which Nolan stood, struck the gate, and knocked Nolan to the ground. Nolan had been hired by Cargill Logistics, as an independent contractor, to haul cattle purchased by Cargill Meat Solutions from the Feed Lot. After a partial summary judgment in favor of Cargill and the Feedlot, trial was to a jury which returned a verdict against Bontke.

Bontke asserts multiple issues on appeal. We overrule them and affirm the judgment.

*Issue 1—Reference to Insurance*

Bontke initially complains of two references to insurance made before the jury. These references occurred when Cargill's attorney was cross-examining Danny Davis, another independent contractor truck driver for Cargill Logistics, about the terms of his contract. Davis was being questioned about whether the latter provided him insurance covering accidents while driving. The witness answered affirmatively, after which Bontke objected because she did not want the jury to know that he (Nolan) had insurance coverage. The trial court sustained the objection and instructed the jury to "disregard the last complete question and answer that you heard in the courtroom . . . and not consider any of it, whatsoever." Later, Davis was asked if his contract with Cargill Logistics obligated him to provide himself with worker's compensation or unemployment insurance. Bontke again objected and requested the trial court to instruct the jury that "the Plaintiffs have not benefited from any insurance pursuant to a contract with Cargill Logistics." Though the trial court did not specifically rule on the

2

objection, it nonetheless told the jury that it should "disregard the last comment, question and answer and not consider it for any purpose whatsoever." The jury was not told that the "Plaintiffs have not benefited from any insurance pursuant to a contract with Cargill Logistics," and this led Bontke to argue on appeal that "Cargill deliberately injected insurance in the case and, with the absence of [a] proper instruction to the jury negating double recovery by Appellant, the jury was clearly confused and became concerned with 'who pays' . . . ." We overrule the issue.

When reviewing issues pertaining to the admission of evidence, we apply the standard of abused discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995). That is, the decision of the trial court must stand unless it failed to comport with controlling rules and principles or was otherwise arbitrary. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). And, should it be shown that the trial court abused its discretion, reversal is not automatic. *Babcock v. Northwest Memorial Hosp.,* 767 S.W.2d 705, 708 (Tex. 1989); *Beall v. Ditmore,* 867 S.W.2d 791, 795 (Tex. App.—El Paso 1993, writ denied). There still must be a showing of harm or prejudice. *Brownsville Pediatric Ass'n v. Reyes,* 68 S.W.3d 184, 193 (Tex. App.—Corpus Christi 2002, no pet.).

Here, the trial court sustained appellant's objections but did not instruct the jury in the manner requested by Bontke. That is where the purported error lay. However, we cannot say she was entitled to the instruction sought because we cannot say that the evidence to which the objections were lodged was inadmissible.

It is true evidence that whether a person was or was not insured against liability is generally inadmissible for purposes of showing that the person acted negligently or

3

wrongfully. TEX. R. EVID. 411. But, allusion to the evidence is not prohibited in all situations. For instance, it may be admissible when offered to prove such things as agency, ownership, or control if those matters are in dispute. *See id.*; *St. Joseph Hosp. v. Wolff,* 999 S.W.2d 579, 595 (Tex. App.—Austin 1999), *rev'd on other grounds,* 94 S.W.3d 513 (Tex. 2002) (finding no abuse of discretion in admitting evidence that the hospital provided malpractice insurance for the doctor because it supported the claim that he was an employee of the hospital and the court gave a limiting instruction); *Thornhill v. Ronnie's I-45 Truck Stop, Inc.,* 944 S.W.2d 780, 793-94 (Tex. App.—Beaumont 1997, writ dism'd by agr.) (finding evidence that loan agreements required one party to provide insurance on a motel admissible because it was offered to show the exercise of control over the motel premises).

At bar, the parties argued about Nolan's employment status with Cargill, or lack thereof. So too did they debate the extent of control maintained by Cargill over the acts and duties of Nolan, as an independent contractor. Answers to questions about whether Cargill provided drivers like Nolan such things as workers' compensation, unemployment, or liability insurance were relevant to those disputes, that is, disputes regarding Nolan's status as an employee or an individual within the control of Cargill. Having an obligation to provide or actually providing such insurance to drivers like Nolan and Davis could be viewed as indicia suggesting they were indeed employees or under the control of Cargill Logistics. Thus, the evidence was relevant and actually admissible, even though the trial court excluded it. And, because it was admissible, Bontke was not entitled to an instruction directing the jurors to disregard what was said.

4

*Issue 2—Exclusion of Expert Witness*

In her second issue, Bontke contends that the "[e]xclusion of . . . [her] rebuttal expert witness precluded imperative testimony and resulted in an improper verdict as to liability." The rebuttal expert in question was Johan Rasty, and, the trial court sustained Cargill's objection to him testifying because he was not properly designated as a witness. We overrule the issue.

Again, the standard of review is one of abused discretion. *K-Mart Corp. v. Honeycutt,* 24 S.W.3d 357, 360 (Tex. 2000) (noting that the decision to exclude testimony is reviewed for abuse of discretion). And where the rules of civil procedure control, the failure to properly designate expert witnesses results in the automatic exclusion of their testimony unless 1) good cause is shown justifying the omission or 2) the omission "will not unfairly surprise or unfairly prejudice the other parties." TEX. R. CIV. P. 193.6(a); *Tranum v. Broadway,* 283 S.W.3d 403, 425 (Tex. App.—Waco 2008, pet. denied); *Perez v. Embree Constr. Group, Inc.,* 228 S.W.3d 875, 884 (Tex. App.—Austin 2007, pet. denied).

Here, the clerk's record illustrates that the trial court executed an "Agreed Discovery Control and Scheduling Order" in December of 2010. Therein, it ordered that "[p]laintiffs must designate each expert witness who may be called at trial and provide a written report from such expert" by "March 31, 2011." In turn, the defendants had until "May 31, 2011" to designate their experts. Then, the scheduling order closed with the statement that "[t]he dates established hereby are firm, but any date, except the trial date, may be amended by the parties by a Rule 11 Agreement, without Court approval" and "[i]f the trial is rescheduled, this Order will be amended as appropriate." The parties

5

subsequently entered into a Rule 11 agreement affecting the aforementioned deadlines. That agreement, the validity of which no one attacks on appeal, consisted of a letter from Bontke's counsel stating:

> We just got our copies of the latest round of depositions late last week. We are working with our experts promptly on this but with the short holiday week and considering the fact that we have to have reports with our designation, I think one final short extension on the expert deadline is in order. I would request that we agree to move both Plaintiff and Defendant deadlines back two weeks. Thus the new Plaintiff deadline would be May 13, 2011 and the new Defendant deadline would be July 14, 2011. If you are in agreement, please sign below and fax back to me as soon as possible. If anyone has an issue with this, would he or she give me a call to let me know right away so we can visit about it.

The original trial date was rescheduled. However, no one moved to modify the dates denoted as "firm" within the scheduling order, at least with regard to those pertaining to the designation of experts. Moreover, Bontke did not designate Rasty as a rebuttal witness until after the lapse of the May 13, 2011 deadline specified in the Rule 11 agreement. Consequently, his testimony was excluded at trial, and Bontke contends that the trial court abused its discretion in doing so.

In addressing the debate before us, we view our opinion in *Alonzo v. Lampkin*, No. 07-12-00030-CV, 2013 Tex. App. LEXIS 13932 (Tex. App.—Amarillo November 13, 2013, no pet.) (mem. op.) as instructive. That case involved a Rule 11 agreement specifying a date by which the parties were to "list each expert's name". *Id.* at *7. Furthermore, Alonzo failed to designate an expert rebuttal witness by that date, and the trial court barred that witness from testifying. Alonzo argued, on appeal, that he was not obligated to designate rebuttal experts under the agreement. We held otherwise by noting that 1) a trial court had a duty to enforce an agreement complying with Texas Rule of Civil Procedure 11, *id.* at *6; 2) a Rule 11 agreement "is contractual in nature"

6

and "interpreted in the same manner as are contracts in general," *id.* at \*7; 3) the plain meaning of the words contained within it determined the extent of the agreement, *id.*; and 4) because the term "experts" was neither defined nor qualified by the parties, it encompassed all experts, including those to be rebuttal witnesses. *Id.* at \*7-8.

Here, the trial court's scheduling order established deadlines by which "each expert witness" was to be designated. Yet, it did not define or qualify the term "expert." Thereafter, the parties executed a Rule 11 agreement extending the "expert deadline." Again, no one defined or qualified the term "expert." Given our opinion in *Alonzo* and the similarity between the facts there and here, we must again conclude that the word "expert" encompassed all experts, including those intended for rebuttal only. Thus, the trial court did not abuse its discretion in barring Rasty from testifying. It was obligated to enforce the parties' own agreement, even though it postponed the trial date. *See Eaton Metal Prods., L.L.C. v. U.S. Denro Steels, Inc., No.* 14-09-00757-CV, 2010 Tex. App. LEXIS 7941, at \*9 (Tex. App.—Houston [14th Dist.] September 30, 2010, no pet.) (mem. op.) (holding that because the date to designate experts contained in the Rule 11 agreement was specific, continuing the trial date did not affect it).

*Issue 3—Summary Judgment*

Bontke next argues that the trial court erred in rejecting her contention that handling livestock was an inherently dangerous activity.[1] Bontke had alleged that Cargill owed Nolan a non-delegable duty to properly protect him while performing his services to the company. The duty was purportedly non-delegable because "cattle

---

[1] The existence of a legal duty is a question of law, *Praesel v. Johnson,* 967 S.W.2d 391, 394 (Tex. 1998), unless the parties dispute the facts giving rise to it.

handling is inherently dangerous." The trial court rejected the contention in granting Cargill's motion for summary judgment, holding that "[a]s a matter of law the handling of commercial livestock is not inherently dangerous." We agree and overrule the issue.

Texas jurisprudence has recognized few activities as inherently dangerous. *Central Ready Mix Concrete Company, Inc. v. Islas*, 228 S.W.3d 649, 652 (Tex. 2007). And, no one has cited us to Texas authority applying the doctrine to the activity of handling cattle. Nevertheless, an activity or work is inherently dangerous if it must result in probable injury to a third person or the public. *Scott Fetzer Co. v. Read*, 945 S.W.2d 854, 861-62 (Tex. App.—Austin 1997), *aff'd,* 990 S.W.2d 732 (Tex. 1998), *quoting Goolsby v. Kenney,* 545 S.W.2d 591, 594 (Tex. Civ. App.—Tyler 1976, writ ref'd n.r.e.); *see also Agricultural Warehouse, Inc. v. Uvalle*, 759 S.W.2d 691, 695 (Tex. App.—Dallas 1988, writ denied) (stating that inherently dangerous work is that which will probably result in injury to a third person or the public); *King v. Associates Commercial Corp.,* 744 S.W.2d 209, 212 (Tex. App.—Texarkana 1987, writ denied) (stating the same). So too must the activity be "dangerous in . . . [its] normal, nondefective state," to be inherently dangerous. *Central Ready Mix Concrete Co. v. Islas*, 228 S.W.3d at 652-53.

While handling cattle may result in injury, we find no evidence of record that it will or must result in probable injury. It is an activity done daily by ranchers and hobbyists without encountering harm. Indeed, young children and students regularly parade steers much larger than their handler around arenas and yards without incident. And, citing us to testimony of a witness suggesting that there are "inherent risks" in handling cattle, as Bontke did here, does not fill the void.

8

There are inherent risks in most any activity; yet, the presence of those risks does not *ipso facto* mean injury or harm will or probably will result due to the conduct of that activity. For instance, electric shock is an inherent risk faced by an electrician; yet, performing electrical work is not an inherently dangerous activity. *See id.* at 652 n.12 (so noting). The same is true of handling explosives; one need not think hard to see what inherent risks may exist there. Yet, it is not an inherently dangerous activity. *Id.* So, it is not enough to simply say that the chance of injury renders the action inherently dangerous. Cows may spook and run and steers may charge or kick under certain circumstances. Those are risks inherent in raising or handling cattle; but without evidence that handling cattle will probably result in injury, we cannot say handling such livestock is inherently dangerous.[2]

Moreover, Nolan's injuries arose from the actions of an agitated steer. Again, it had been moved into a pen containing another animal with a broken leg. The idea behind the action was to have the healthy animal induce the injured one into the cattle trailer. Why the healthy steer grew agitated is not clear; some evidence suggests that the door of the trailer may have fallen on the animal. Yet, it is clear that the animal that caused Nolan's injury was not in its "normal" state and, as previously mentioned, it is the probability of danger arising from an activity's "normal, nondefective state" that

---

[2] It is also this distinction that renders Bontke's reference to section 87 of the Civil Practice and Remedies Code inapposite. The statute speaks of risks encountered in participating in equine activities, livestock shows and the like. TEX. CIV. PRAC. & REM. CODE ANN. § 87.003 (West Supp. 2012). Intending to limit one's liability for such risks, the legislature enacted section 87 of the Civil Practice and Remedies Code. Yet, nowhere in the statute did the legislature declare that the activities encompassed by the provision were inherently dangerous. And, to deduce that merely because the legislature opted to limit liability, it must have concluded that the activities were inherently dangerous (that is, will or probably will result in injury) is rather absurd. Following the same logical process would mean that having a picnic on a farm or ranch would be inherently dangerous. Such is a recreational activity encompassed by section 75.001 *et seq.* of the Civil Practice and Remedies Code, which statute limits the liability of landowners for injuries occurring on their land. TEX. CIV. PRAC & REM. CODE ANN. § 75.001 *et. seq.* (West 2011). A common picnic is not an inherently dangerous activity.

9

determines whether the activity is inherently dangerous. *Id.* at 652-53. Again, we neither found nor were cited to evidence illustrating that cattle are particularly dangerous in their normal environment or even when being taken from pens and loaded into trailers.

*Issue 4—Sufficiency of the Evidence*

Bontke next challenges the factual sufficiency of the evidence underlying the answers of the jury to various questions posed it. Those questions included: 1) "Did Cargill Meat Logistics Solution's [sic], Inc. exercise actual control over the loading and unloading of cattle as stated in Nolan Bontke's owner-operator agreement," to which the jury answered "no"; 2) "Did the negligence, if any, of Tulia Feedlot, Inc. proximately cause the occurrence in question," to which the jury answered "no"; 3) "Did Tulia Feedlot, Inc. engage in a negligent undertaking which was a proximate cause of the occurrence," to which the jury answered "no"; and 4) "Did the negligence, if any of . . . [Nolan Bontke] . . . proximately cause the occurrence in question"; and 5) "For each person you found caused or contributed to cause the occurrence, find the percentage of responsibility attributable to each." The responsibility attributed to Nolan was "80%," while "20%" was attributed to Serna, another truck driver employed by an entity other than Cargill. We overrule the issue.

The pertinent standard of review is that discussed in *Dow Chemical Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001). We apply it here.

Bontke does not deny that some evidence supports the jury's answers to the questions at issue. And, in the case of Nolan's own negligence and the percentage of responsibility assigned to him, little is said about what contrary evidence overwhelmed

10

that on which the jury apparently relied.[3] This makes our analysis of the point difficult given that the jury heard about how Nolan entered a shoot or pen containing an agitated steer and failed to latch the gate behind which he stood while the animal ran toward it. Given this, we cannot say that the answer finding him negligent and 80% responsible for his injuries was manifestly unjust.

As for the jury finding that Cargill Logistics did not exercise actual control over the loading and unloading of cattle, there is evidence that the company exercised some control over the activities of Nolan. Yet, other evidence illustrated that Nolan was an independent contractor operating a truck trailer for Cargill Logistics. Furthermore, general contractors, like Cargill Logistics, are afforded some latitude in telling independent contractors what to do in general terms. *Johnston v. Oiltanking Houston, L.P.,* 367 S.W.3d 412, 419 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Consequently, exercising or retaining a general right to recommend a safe manner in which to perform work is not sufficient to subject the general contractor to liability. *Dow Chemical Co. v. Bright,* 89 S.W.3d 602, 607 (Tex. 2002). Nor does requiring 1) compliance with certain specifications or use of certain materials or 2) the attendance at safety meetings mandate a finding of control. *Union Carbide Corp. v. Smith,* 313 S.W.3d 370, 377-78 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Also, obligating the independent contractor to comply with safety guidelines may not be enough. *Abarca v. Scott Morgan Residential, Inc.,* 305 S.W.3d 110, 123 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). And, the same is true of retaining or exercising the authority to tell the independent contractor when to start, stop, or resume work.

---

[3] Bontke does allude to Rasty's testimony about the time available to close the gate behind which Nolan stood and whether it was sufficient to permit him to do that. Yet, we concluded that the trial court did not abuse its discretion in excluding it. So, it cannot be considered in the equation.

*Johnston v. Oiltanking Houston, L.P.,* 367 S.W.3d at 419. We finally note that in situations where the purported retention of control over an independent contractor is the basis for assigning liability, there must be a nexus between the control retained and the condition or activity causing the injury. *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 294 (Tex. 2004)

Here, evidence of record indicates that 1) Cargill Logistics required Nolan to pass an initial application process, 2) Cargill Logistics inspected Nolan's truck, 3) Nolan had to pass drug tests, 4) Cargill Logistics held safety meetings and provided training materials to those driving for it, 5) Cargill Logistics assigned its drivers locations and times at which they were to appear, and 6) Cargill Logistics had a policy against loading non-ambulatory animals. Yet, other evidence illustrates that 1) Nolan was an independent contractor who was not loading his own trailer when he was injured but rather that of another individual (Serna) who worked for someone not under contract to Cargill Logistics, 2) Nolan's injury did not occur on Cargill's property but on the site of the feed lot over which Cargill had no right of control, 3) Nolan's contract with Cargill Logistics provided that he was responsible for "loading and unloading of products onto or off the Equipment, or onto or off trailers which may be pulled by the Equipment," 4) Nolan had the obligation, via his contract, of determining "the method, means and the manner of performing this Agreement," 5) independent contractors were not required to attend safety meetings, 6) Cargill Logistics did not direct Nolan to load the injured animal, and 7) Cargill Logistics did not direct or request a feedlot employee to load the injured animal. At the very least, the evidence of control was controverted, and given

12

the totality of the record, the jury's refusal to find that Cargill Logistics exercised the requisite control over the activity causing Nolan's injury was not manifestly unjust.

As to the Feedlot's purported negligence, it was premised on the Feedlot manager's alleged acceptance of Cargill Logistics' request to "oversee the situation." Bontke contends that the manager failed to 1) recognize that the healthy escort steer was agitated, 2) wait until the steer calmed down before loading it, 3) know where Serna was or anyone else who might further agitate the steer, and 4) stop the loading process when he realized that Serna had not followed his instructions to forgo loading the rest of the cattle into the truck.[4]

Yet, there is no evidence that either Cargill entity requested the manager to "oversee" the loading process. Instead, the manager testified that he merely was told of some unidentified problem and asked to see what it was, sat for several minutes watching Nolan try to load the injured steer by himself before deciding to assist him, would not have tried to load the steer if the decision had been his to make, and the decision had already been made to load the steer before he got there. Other evidence indicated that 1) the steer was not initially agitated but possibly became so only as it attempted to enter the trailer and had the trailer door drop upon its back, 2) the alley gate should have been latched as soon as the steer passed through it, 3) Nolan had time to latch the gate before the steer returned, 4) if the gate was not latched, Nolan should not have been standing behind it, and 5) Serna, whose responsibility it was to load the steer, prematurely loaded the rest of the cattle causing the escort steer to be loaded alone and then dropped the trailer door on its back.

---

[4] There was evidence about cattle being pack animals which prefer to be with other animals and become nervous when alone. Therefore, the Feedlot manager had requested Serna to stop loading the rest of the cattle so that the escort steer could be loaded with them.

The jury was free to choose what evidence it cared to believe. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 777 (Tex. 2010). It was also free to make its own reasonable inferences from that evidence. *Lee Lewis Const., Inc. v. Harrison,* 64 S.W.3d 1, 6 (Tex. App.—Amarillo 1999), *aff'd,* 70 S.W.3d 778 (Tex. 2001). The evidence it believed and the reasonable inferences made from that evidence supported its verdict, and the controverting evidence does not render that verdict manifestly unjust.

*Issue 5—Cumulative Impact*

Finally, Bontke argues that the cumulative impact of the errors justify a reversal of the judgment. Having failed to find any error, we overrule the issue.

Accordingly, the judgment is affirmed.


Brian Quinn
Chief Justice